869 P.2d 1304

**In the Interest of John DOE, Born on January 5, 1976, Juvenile.**

No. 15986.

Supreme Court of Hawai'i.

Feb. 28, 1994.

Todd Eddins, Deputy Public Defender, on the briefs, Honolulu, for juvenile-appellant.

Alexa D.M. Fujise, Deputy Pros. Atty., on the briefs, Honolulu, for plaintiff-appellee.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

LEVINSON, Justice.

The present appeal requires us to answer the following significant question of first impression in this jurisdiction: What are the constitutional constraints placed upon the state's power to prosecute a criminal defendant for the offense of "harassment," in violation of Hawai'i Revised Statutes (HRS) § 711–1106(1)(b) (1985),[1] by the "fighting

1. Hawai'i Revised Statutes (HRS) § 711–1106 (1985) provides in relevant part:

*Harassment.* (1) A person commits the offense of harassment if, with intent to harass, annoy, or alarm another person, he:

words" doctrine originally enunciated in *Chaplinsky v. New Hampshire*, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942)? The issue arises in the context of the juvenile-appellant John Doe's (the Minor) claim that the evidence presented at his adjudication hearing, pursuant to the petition filed by the state, was insufficient to permit the district family court to adjudge him a "law violator" in accordance with HRS ch. 571 (1985 & Supp.1992)[2] and the Hawai'i Family Court Rules (HFCR).[3] Because, for the reasons stated in this opinion, the evidence was insufficient as a matter of law to establish that the Minor violated HRS § 711–1106(1)(b), we reverse the district family court's order and

. . . .

(b) Insults, taunts, or challenges another person in a manner likely to provoke a violent response[.]

. . . .

(2) Harassment is a petty misdemeanor.

HRS § 711–1106 was amended by the legislature in 1992, subsequent to the Minor's adjudication hearing. Act 292, § 4, 1992 Haw.Sess.Laws 752–53. The material legislative history surrounding the amendment is discussed below.

2. HRS § 571–2 (1985 & Supp.1992) defines "child" and "minor" interchangeably to mean "a person less than eighteen years of age" and describes as a "law violator under [HRS §] 571–11" any minor "who comes into the family court upon allegations [that the minor] has committed an act which would constitute a crime if committed by an adult."

HRS § 571–11 (1985 & Supp.1992) provides in relevant part:

*Jurisdiction; children.* Except as otherwise provided in this chapter, the [family] court shall have exclusive original jurisdiction in proceedings:

(1) Concerning any person who is alleged to have committed an act prior to achieving eighteen years of age which would constitute a violation or attempted violation of any federal, state, or local law or municipal ordinance. . .

. . . . .

HRS § 571–21 (1985 & Supp.1992) provides in relevant part:

*Complaint; investigation; petition.* (a) . . . [W]henever the [family] court is informed by any person that a minor is within the purview of [HRS §] 571(1) . . . [,] [t]he court may authorize the filing of a petition. . . .

. . . .

(d) In [minors'] cases, under [HRS §] 571–11(1) . . . , the petition and all subsequent court documents shall be suitably entitled so as to

decree and remand for the entry of an order dismissing the petition.[4]

## I. *BACKGROUND*

On November 14, 1991, pursuant to HRS § 571–11(1) (1985), a petition was filed in the Family Court of the First Circuit Court, State of Hawai'i, alleging that:

On or about the 20th day of September, 1991, in the City and County of Honolulu, State of Hawai[']i, [the Minor], with intent to harass, annoy, or alarm Officer Timothy Mariani, did insult, taunt, or challenge said Officer Timothy Mariani, in a manner like-

indicate that the proceeding is in the interest of rather than against the ... minor involved. The petition shall be verified and statements may be made upon information and belief. It shall set forth plainly ... the facts which bring the [minor] within the purview of this chapter. . . .

HRS § 571–41(c) (1985) provides in relevant part that "[f]indings of fact by the judge or district family judge of the validity of the allegations in ... petitions alleging the court's jurisdiction under [HRS §] 571–11(1) ... shall require proof beyond a reasonable doubt in accordance with rules of evidence applicable to criminal cases."

3. Part D of the Hawai'i Family Court Rules (HFCR), consisting of HFCR 121 through 158, govern "juvenile proceedings" of the type involved in this appeal. *See* HFCR 121(a) (1982). HFCR 121(b) (1982) defines "petition" to mean "the legal document containing the allegations upon which the [family] court's jurisdiction is based." The same rule defines "adjudication hearing" to mean "a hearing for the purpose of determining whether the allegations of a petition are admitted or established under the provisions of [HRS ch.] 571 and these rules." HFCR 125 (1982) provides in relevant part that "[t]he petition shall set forth, in plain language and with reasonable particularity, the date, place, and manner of the acts alleged and the law ... allegedly violated." HFCR 143 (1982) provides in relevant part that "[i]n law violation cases arising under HRS [§] 571–11(1) all material facts shall be proved beyond a reasonable doubt." HFCR 144 (1982) provides in relevant part that "[i]f, upon the conclusion of the adjudication hearing, the [family] court determines that the material allegations of the petition are established, ... it may enter an order granting the prayer of the petition."

4. In light of the result that we reach, we decline to address the Minor's additional claim that a portion of the sentence imposed by the family district court violated his constitutional rights

ly to provoke a violent response, thereby committing the offense of Harassment in Violation of [HRS §] 711–1106(1)(b).

An adjudication hearing was conducted in the district family court on February 3, 1992. The prosecution called Officer Mariani as its sole witness, and the Minor (who was represented by counsel) adduced the testimony of four witnesses, including himself.

The unchallenged findings of fact (FOF), as entered by the district family court on April 15, 1992 pursuant to HFCR 52(a) (1982),[5] were in relevant part as follows:

1. [The Minor] is the subject minor of this matter whose birth date is January 5, 1976;

2. The events which form the basis of this matter occurred near and at the Minor's residence, 1137 Hala Drive, Apt. No. 13–B, also known as Lanakila Housing (hereinafter "Housing"), which is situated in the City and County of Honolulu, State of Hawai['i];

3. On September 20, 1991, Officer Timothy Mariani from the Honolulu Police Department, responded to a complaint of noise from a "loud radio" within the Housing area;

4. Upon his arrival at the Housing area, Officer Mariani approached four males who were seated upon a wall, constructed alongside a road within the Housing area;

5. The Minor was one of the four males present and seated upon this wall and was questioned by Officer Mariani about his age [6] and absence from school;

6. The Minor's response to Officer Mariani's inquiry relating to school was that he was "sick", after which the Minor was escorted back to his home on foot by Officer Mariani;

7. ... [T]he Minor was angry and upset about the situation and manner in which Officer Mariani was treating him;

8. The Minor was in his house and Officer Mariani was outside of the home, just outside the front screen door, when the Minor was being questioned by his mother;

9. ... [T]he Minor's response and conversation with his mother was sarcastic, disrespectful, and vulgar;

10. ... Officer Mariani verbally reacted to the Minor's statements and conversations [sic] with his mother, and told the Minor that he should not speak to his mother in that fashion;

11. The Minor's reaction in a very loud and menacing tone was that if Officer Mariani wanted to "go", he should take off his badge and gun; [7]

---

against self-incrimination and to the freedom of speech.

5. HFCR 52(a) (1982), entitled "findings by the court," provides in relevant part:

*Effect.* In all actions tried in the family court, the court may find the facts and state its conclusions of law thereon or may announce or write and file its decision or "decision and order" and direct the entry of or enter the appropriate decree or order; except upon notice of appeal filed with the court, the court shall enter its findings of fact and conclusions of law where none has [sic] been entered, unless the written decision or "decision and order" of the court contains findings of fact and conclusions of law....

The Minor's counsel requested written findings of fact and conclusions of law following the district family court's oral announcement of its decision on February 3, 1992. HFCR 52(a) would have required them in any event upon the Minor's filing of his notice of appeal on March 17, 1992.

6. On September 20, 1991, the Minor was fifteen years old.

7. Officer Mariani testified at the adjudication hearing that the Minor said, "If you think you're so tough[,] take off your badge." 2/3/92 Tr. at 10, 29. The Minor's mother testified that the Minor said, " 'Look, I not getting smart with you. So, if you like go, go take off your badge.' " *Id.* at 74. The Minor testified that, in response to a statement by Officer Mariani, he said, "Yeah, take off your gun and badge." *Id.* at 90.

Notwithstanding the district family court's FOF No. 11, we are compelled to note that the record contains no evidence whatsoever of the Minor's "tone" when he uttered the statement in question on September 20, 1991. No questions were posed of any witness soliciting any characterization of the Minor's "tone," and no testimony was volunteered in this regard. This fact is significant because the only *conduct* precipitating the Minor's harassment arrest consisted of verbal expression. *See Anniskette v. State,* 489 P.2d 1012, 1013 (Alaska 1971).

12. Following this response by the Minor, and without permission from the Minor or mother, Officer Mariani entered the home and arrested the Minor for Harassment[.] [8]

Based on the foregoing FOF, the district family court concluded that "there is proof beyond a reasonable doubt ... that the Minor, with intent to harass, annoy, or alarm Officer Mariani, did insult, taunt, or challenge Officer Mariani *in a manner that was likely to provoke a violent response.*" (Emphasis added.) Accordingly, on February 4, 1992, the district family court entered an "amended findings, order and decree" adjudging the Minor a law violator for having committed the offense of harassment, in violation of HRS § 711–1106(1)(b).

On February 20, 1992, the Minor filed a "motion for reconsideration of verdict." A hearing was conducted on March 13, 1992, following which the district family court entered an "order and decree" denying the motion. The Minor timely filed his notice of appeal.

## II. DISCUSSION

### A. Elements Of The Offense Of Harassment

■ "Harassment ... is a form of disorderly conduct aimed at a single person, rather than at the public." Commentary on HRS § 711–1106 (1985), at 273.[9] Because police officers are not considered members of the public, "[a] person may not be arrested for disorderly conduct as a result of activity which annoys only the police.... Policemen are trained and employed to bear the burden of hazardous situations, and it is not infrequent that private citizens have arguments with them." Commentary on HRS § 711–1101 (1985), at 268. "An individual policeman *may,* however, be the object of harassment under [HRS] § 711–1106," *id.* at 268 n. 1 (emphasis added), because HRS § 711–1106(1)(b) is "aimed at preserving peace. It prohibits insults, taunts, or challenges *which are likely to provoke a violent or disorderly response.* This is distinguished from disorderly conduct because it does not present a risk of *public* inconvenience or alarm." Commentary on HRS § 711–1106, at 273 (emphasis added).

■ A person commits the offense of harassment, in violation of HRS § 711–1106(1)(b), "if, with intent to harass, annoy, or alarm another person," the person "[i]nsults, taunts, or challenges another person in a manner *likely to provoke a violent response.*" (Emphasis added.) [10]

8. Officer Mariani testified that he arrested the Minor "to avoid any further confrontation." 2/3/92 Tr. at 11. He also testified that March 1992 would mark his eleventh year as a Honolulu police officer and that he weighed approximately 220 pounds and was approximately six feet tall. *Id.* at 4, 29. By contrast, the Minor's counsel represented to the district family court, in the course of the March 13, 1992 hearing on the Minor's motion for reconsideration, that the Minor was five feet nine inches in height and weighed 130 pounds. 3/13/92 Tr. at 4. The deputy prosecuting attorney did not challenge the representation. Although a preliminary paragraph of the district family court's findings of fact and conclusions of law, filed on April 15, 1992, stated that the Minor's presence was waived, the transcript of the March 13, 1992 proceedings reflects that the Minor was present. *Id.* at 2. Accordingly, the prosecution apparently had an opportunity to question the Minor under oath regarding his height and weight.

9. The disorderly conduct statute, HRS § 711–1101 (1985), provides in relevant part:

(1) A person commits the offense of disorderly conduct if, with intent to cause physical inconvenience or alarm by a member or members of the public, [the person]:

(a) Engages in fighting or threatening, or in violent or tumultuous behavior; or

. . . .

(c) Makes any offensively coarse utterance, gesture, or display, or addresses abusive language to any person present, which is likely to provoke a violent response[.]

. . . .

(3) Disorderly conduct is a petty misdemeanor if it is the defendant's intention to cause substantial harm or serious inconvenience, or if he [or she] persists in disorderly conduct after reasonable warning or request to desist. Otherwise disorderly conduct is a violation.

*See* HRS § 701–107 (1985 & Supp.1992) (defining "[g]rades and classes of offenses").

10. The 1992 amendment to HRS § 711–1106(1)(b), *see supra* note 1, which does not directly govern this case, inserted language requiring, *inter alia*, that the "insult, taunt, or challenge" be uttered "in a manner likely to provoke an *immediate* violent response." HRS

"HRS § 701–114[ (1)(a) and (c) (1985) ] requires proof beyond a reasonable doubt of each element of the offense, as well as '[t]he state of mind required to establish each element of the offense.'" *State v. Chung,* — Haw. —, —, 862 P.2d 1063, 1070 (1993) (quoting *State v. Pinero,* 75 Haw. 282, 300, 859 P.2d 1369, 1378 (1993) (brackets in original).

Moreover, HRS § 702–204 (1985) provides in relevant part that "a person is not guilty of an offense unless he [or she] acted intentionally, knowingly, recklessly, or negligently, as the law specifies, with respect to each element of the *offense.*" Finally, HRS § 702–207 (1985) provides that "[w]hen the definition of an offense specifies the state of mind sufficient for the commission of that offense, without distinguishing among the elements thereof, the specified state of mind shall apply to all elements of the offense, unless a contrary purpose plainly appears."

*Id.*

Inasmuch as "[t]he *intent* to harass, annoy, or alarm another person must be proved" in order to establish the offense of harassment in violation of HRS § 711–1106(1)(b), *see* commentary on HRS § 711–1106, at 273 (emphasis added), and no contrary purpose "plainly appears" on the face of the statute, it therefore follows that "intent" is the requisite state of mind for each of the elements set forth in HRS § 711–1106(1)(b).[11] And, "pursuant to HRS § 702–205 (1985), that state of mind applies to such conduct, attend-ant circumstances, and results of conduct as are specified by the definition of the offense." *Chung,* — Haw. at — n. 8, 862 P.2d at 1071 n. 8.

Thus, at the time of the adjudication hearing, there were three material elements of the offense of harassment, as prohibited by HRS § 711–1106(1)(b) and alleged in the petition, each of which the prosecution was required to prove beyond a reasonable doubt in order to establish that the Minor was a law violator in this case. These three elements were: (1) that the Minor insulted, taunted, or challenged Officer Mariani (*i.e.,* the prohibited conduct); (2) that the Minor did so in a manner likely to provoke a violent response [12] on Officer Mariani's part (*i.e.,* the result of the prohibited conduct); and (3) that the Minor did so with intent to harass, annoy, or alarm Officer Mariani (*i.e.,* the requisite state of mind). The ultimate question before us is whether, as a matter of law, the prosecution failed to prove any of these three elements.[13] That question places squarely in issue the legal sufficiency of the evidence adduced at the Minor's adjudication hearing.

### B. *Sufficiency Of The Evidence*

#### 1. *Standard of review*

We have long held that evidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the

---

§ 711–1106(1)(b) (Supp.1992) (emphasis added). The only relevant legislative history suggests that the legislature intended the "immediacy" of the violent response to be a "technical, nonsubstantive change." *See* Hse.Conf.Comm.Rep. No. 57, in 1992 House Journal, at 815–16; Hse.Stand. Comm.Rep. No. 1149–92, in 1992 House Journal, at 1333–34. Thus, by inference, the legislature originally assumed that HRS § 711–1106 (1985) required the same "immediacy." *Cf. Franks v. City and County of Honolulu,* 74 Haw. 328, 340 n. 6, 843 P.2d 668, 674 n. 6 (1993) ("[T]his court has used subsequent legislative history or amendments to confirm its interpretation of an earlier statutory provision."); *Mollena v. Fireman's Fund Ins. Co. of Hawaii, Inc.,* 72 Haw. 314, 324–25, 816 P.2d 968, 973 (1991) (subsequent statutory amendment construed to reflect original legislative intent). As we will discuss below, such an assumption would be consistent

with the fact that the Model Penal Code, which applied the "fighting words" doctrine as enunciated in *Chaplinsky v. New Hampshire,* 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), in formulating the offense of harassment, was "used by the Judicial Council of Hawai'i as the guide for the Hawai['Ji Penal Code." Sen.Stand. Comm.Rep. No. 599, in 1971 Senate Journal, at 1067.

11. *See* HRS § 702–206(1) (1985) for the applicable definitions of "intentional" conduct.

12. In cases prosecuted under HRS § 711–1106 (Supp.1992), the word "immediate" would precede the phrase "violent response." *See supra* note 10.

13. The only real dispute between the parties concerns element two.

legal sufficiency of such evidence to support a conviction; the same standard applies whether the case was before a judge or a jury. The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact.

*State v. Batson,* 73 Haw. 236, 248, 831 P.2d 924, 931, *recon. denied,* 73 Haw. 625, 834 P.2d 1315 (1992) (citations omitted); *see also State v. Silva,* 75 Haw. 419, 432, 864 P.2d 583, 590 (1993) (citations omitted). " 'Substantial evidence' as to every material element of the offense charged is credible evidence' which is of sufficient quality and probative value to enable a [person] of reasonable caution to support a conclusion." *Batson,* 73 Haw. at 248–49, 831 P.2d at 931 (citation omitted). *See also Silva,* 75 Haw. at 432, 864 P.2d at 590 (quoting *State v. Matias,* 74 Haw. 197, 207, 840 P.2d 374, 379 (1993)); *State v. Aplaca,* 74 Haw. 54, 64–65, 837 P.2d 1298, 1304 (1992) (citations omitted).

▮▮▮▮ Where an adjudication of guilt is premised solely upon the spoken word, however, constitutional considerations are necessarily implicated.[14]

When possible, we interpret enactments of the [l]egislature contained in the crimi-

nal code so as to uphold their constitutionality. We must presume that such legislation purports to operate within the limitations of our state and federal constitutions. Both article I, § 4 of the [state] [c]onstitution and the first amendment [to] the United States Constitution protect the people against governmental encroachment on their freedom of speech.

*State v. John W.,* 418 A.2d 1097, 1101 (Me. 1980); *See also Koike v. Board of Water Supply,* 44 Haw. 100, 107, 352 P.2d 835, 840 (1960) (" 'The presumption is that the legislature intended to do what it had a right to do and that it did not intend to do what it could not legally do.' ") (quoting *Smithies v. Conkling,* 20 Haw. 600, 604 (1911)).

▮▮▮▮ "Whether speech is protected by the first amendment [to the United States Constitution], as applied to the states through the due process clause of the fourteenth amendment, is a question of law which is freely reviewable on appeal." *Chung,* 75 Haw. 398–415, 862 P.2d at 1072 (citing *Rankin v. McPherson,* 483 U.S. 378, 386 & n. 9, 107 S.Ct. 2891, 2897–98 & n. 9, 97 L.Ed.2d 315, *reh'g denied,* 483 U.S. 1056, 108 S.Ct. 31, 97 L.Ed.2d 819 (1987)).[15] The same proposition holds true with respect to article I, section 4 of the Hawai'i Constitution (1978).[16]

---

14. *See e.g., Cohen v. California,* 403 U.S. 15, 18–19, 91 S.Ct. 1780, 1784–85, 29 L.Ed.2d 284, *reh'g denied,* 404 U.S. 876, 92 S.Ct. 26, 30 L.Ed.2d 124 (1971), in which the United States Supreme Court reversed a "disturbing the peace" conviction in a state court and declared, *inter alia,* that

> a conviction resting solely upon "speech" ... can be justified, if at all, only as a valid regulation of the manner in which [the defendant] exercised [the] freedom [of speech], [and] not as a permissible prohibition on the substantive message it conveys. This does not end the inquiry, of course, for the [f]irst and [f]ourteenth [a]mendments have never been thought to give absolute protection to every individual to speak whenever or wherever he [or she] pleases or to use any form of address in any circumstances that he [or she] chooses.

*See also Anniskette,* 489 P.2d at 1013, in which the Alaska Supreme Court reversed convictions of disorderly conduct and disturbing the peace where the "communicative utterances which [were] the subject of prosecution ... constitute[d] the sole form of behavior for which the defendant was prosecuted." The court noted that "[u]nder the [f]irst [a]mendment to the [United States] Constitution, it is only in the most

limited circumstances that speech may be punished." *Id.* (footnote omitted).

15. The first amendment to the United States Constitution provides in relevant part that "Congress shall make no law ... abridging the freedom of speech." Freedom of speech is "among the fundamental personal rights and 'liberties' protected by the due process clause of the [f]ourteenth [a]mendment from impairment by the States." *Gitlow v. New York,* 268 U.S. 652, 666, 45 S.Ct. 625, 630, 69 L.Ed. 1138 (1925).

16. Article I, section 4 of the Hawai'i Constitution (1978) provides in relevant part that "[n]o law shall be enacted ... abridging the freedom of speech." "The rights specified in this section, virtually unchanged since statehood, are often referred to as 'first amendment rights' because they are identical to those found in the [f]irst [a]mendment to the [United States] Constitution." A.F. Lee, *The Hawai'i Constitution* 37 (1993). Professor Friesen has noted that "[s]tate free speech provisions are not generally violated by criminal statutes that, properly drawn, are aimed at the *injurious effects* of a threatening communication rather than the *communication*

Correlatively, "[o]ur customary deference to the trial court upon essentially a factual question is qualified by our duty to review the evidence ourselves in cases involving a possible infringement upon the constitutional right of free expression." *State v. Nelson,* 38 Conn.Supp. 349, 353, 448 A.2d 214, 217 (Conn.Super.Ct.1982) (citing, *inter alia, Jacobellis v. Ohio,* 378 U.S. 184, 190, 84 S.Ct. 1676, 1679, 12 L.Ed.2d 793 (1964)).

### 2. *Harassment, free speech, fighting words, and the likelihood of a violent response*

We now turn to the core of the Minor's appeal. The Minor urges that his "'challenge' to Officer Mariani [did] not constitute [h]arassment within the ambit of HRS § 711–1106 because [his] words [were] not likely to provoke a violent response in a police officer." Minor's opening brief at 8. Specifically, the Minor insists that "[u]nder the [f]irst [a]mendment this so called challenge [did] not amount to what the Supreme Court of the United States has classified as fighting words." 3/13/92 Tr. at 5.

Noting that the "Minor concedes, however, that a person may be convicted of harassment under [HRS §] 711–1106 ... for words directed toward police officers," State's answering brief at 7, the prosecution retorts that

the fact that the addressee and object of harassment [was] a police officer is not a defense available to [the] Minor under [HRS §] 711–1106[.] [HRS §] 711–1106 ... makes no distinction between the types of persons to whom "taunts or challenges" are uttered. Likewise, [HRS §] 711–1106 ... prohibits all insults, taunts, or challenges of another person *that are likely to provoke a violent response,* re-

gardless of the object of the harassment or the degree of the inflammatory language.

*Id.* at 8–9 (emphasis added).

The district family court sided with the prosecution's position at the adjudication hearing, ruling as follows:

[I]f there's one thing that's consistent [in the record] it's the fact that you challenged [Officer Mariani]. That you told [him], "Hey, if you like go, take your badge off." You told him that. You admitted that on the stand.

Okay?

Right or wrong I disagree with your attorney ... that this was a protected so-called [f]irst [a]mendment right. No doubt you have your right to express yourself, express how you feel about the situation. You can call him every name in the book,[17] tell him this, tell him that, but when it comes down to actually challenging the officer for [sic] a fight you violated the [s]tatute.... You insulted, you taunted or you challenged him [in a manner] likely to provoke a violent response, whether he's an officer or not.

2/3/92 Tr. at 100–01.

We begin our analysis with the fact that HRS § 711–1106 is a provision of the Hawai'i Penal Code (HPC), which was originally enacted in its entirety as Act 9, 1972 Haw.Sess. Laws 32–142, and took effect on January 1, 1973. Two aspects of the legislative history underlying the original enactment of the HPC are particularly noteworthy. First, the legislature recognized that HRS ch. 711 (offenses against public order), of which HRS § 711–1106 is a part, "normally involves first amendment issues." Hse.Stand.Comm.Rep. No. 227, in 1971 House Journal, at 786. Second, the Model Penal Code (MPC), as adopted at the 1962 annual meeting of The American Law Institute, was "used by the Judicial Council of Hawai[']i as the guide for

*itself."* J. Friesen, *State Constitutional Law: Litigating Individual Rights, Claims and Defenses* § 5.04[3] at 5–20 to 5–20.1 (1993) (emphasis added and footnote omitted).

17. Presumably, the district family court was engaging in hyperbole when it opined that the Minor could have called Officer Mariani "every

name in the book." Implicitly, the court was suggesting that the Minor could have hurled any denigrating epithet or slur he desired at the officer, regardless of the likelihood that it would "provoke a violent response." This is a questionable proposition. In any event, we are dealing with a purported "challenge" in this appeal, rather than a denigrating "taunt" or "insult."

the [HPC]." Sen.Stand.Comm.Rep. No. 599, in 1971 Senate Journal, at 1067. We therefore look to the MPC and its comments to inform our effort to glean the scope of, and constitutional limitations on, HRS § 711–1106.

The prototype of HRS § 711–1106 is found in section 250.4 of the MPC, which codified the offense of harassment. Model Penal Code and Commentaries (Official Draft and Revised Comments) (1980). MPC § 250.4(2), the analogue of HRS § 711–1106(1)(b) in its original form, provided that a person committed the offense of harassment if, "with purpose to harass another," the person "insults, taunts or challenges another in a manner likely to provoke [a] violent or disorderly response." *Id.* at 359–60. The commentary on MPC § 250.4(2) characterized the offense as "[h]arassment by [f]ighting [w]ords." *Id.* at 364 (emphasis deleted).

The United States Supreme Court first articulated the "fighting words" doctrine, as such, in *Chaplinsky v. New Hampshire, supra,* as follows:

[T]he right of free speech is not absolute at all times and under all circumstances. There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any [c]onstitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or *"fighting" words*—those *which by their very utterance* inflict injury or *tend to incite an immediate breach of the peace*.... [S]uch utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.

315 U.S. at 571–72, 62 S.Ct. at 769 (emphasis added and footnotes omitted).

 Unfortunately, the *Chaplinsky* decision "left unsettled" a number of critical questions, including "what exactly is the constitutional minimum for the punishment of words because of their capacity to provoke

violence." K. Greenawalt, *Speech, Crime, and the Uses of Language* 294 (1989). It is in this regard that the commentary on MPC § 250.4(2) is particularly enlightening, especially where a police officer is the object of an insult, taunt, or challenge:

*The paradigm case covered by Subsection (2) is the intentional utterance of words so assaultive of personal dignity that they are likely to provoke physical retaliation against the speaker.* It is the prospect of violence and disorder that the provision seeks to avoid and not merely unwelcome or unfriendly conversation. The scope of the offense must be determined in light of its underlying purpose to prohibit speech that is *likely* to precipitate unlawful action.... Whether such likelihood exists is determined *objectively.*[18] ... Liability is premised on the risk intentionally created by the actor rather than on the potentially idiosyncratic reactions of others. *That the standard* of "likely to provoke violent or disorderly response" *is objective* in character, however, *does not mean that it is uniform in all situations.* Often, this issue will turn on a matter of *context.* Thus, words provoking a stranger to violence might be received by a friend as nothing more than backhanded familiarity. And insulting language that would pass as commonplace in army boot camp might evoke the strongest possible response if used in another place.

Finally, there is the arguably *special case of fighting words addressed to a police officer.* Many persons expect the policeman to treat such provocation with greater restraint than would his civilian counterpart. The peace officer is trained to a professional standard of behavior that ordinary citizens might not be expected to equal. Furthermore, the policeman's career brings him into continual contact with the belligerent and the uncivil. This experience may render him less likely to fly into a rage and respond to insulting words with physical violence. These reasons may alone be persuasive, but advocates of a

---

18. *Cf. In re John Doe, Born on April 29, 1971,* 7 Haw.App. 582, 584, 788 P.2d 173, 175 (1990) ("With respect to the likelihood of provoking a violent response" for purposes of HRS § 711–1106(1)(b), "the relevant test is objective, not subjective.")

special standard for fighting words addressed to a peace officer also confess to a fear of abusive prosecution if no such adjustment is made. Insult and challenge by an arrestee are so frequent and so commonly disregarded that the occasional reliance on such conduct as a basis for arrest raises the spectre of selective enforcement and discriminatory application of the laws. Taken together, these arguments seem adequate to support construction of the statutory phrase "likely to provoke violent or disorderly response" to *exclude most verbal abuse of a law enforcement officer, at least when he is acting in the line of duty.*

Commentary on MPC § 250.4(2) at 365–66 (emphasis added and footnotes omitted).

Although this court's case law construing the application of HRS § 711–1106 to insults, taunts, or challenges directed at police officers is sparse, it is nonetheless consonant with the MPC's insistence that, in order to pass constitutional muster, the "context" of the allegedly offending expression be the central focus. For example, in *State v. Jendrusch*, 58 Haw. 279, 567 P.2d 1242 (1977), we reversed a disorderly conduct conviction under HRS § 711–1101,[19] premised solely upon "alleged[ly] abusive language ... directed towards the arresting [police] officer." *Jendrusch*, 58 Haw. at 282 n. 3, 567 P.2d at 1245 n. 3. Although the holding of *Jendrusch* was that the complaint charging the defendant was "constitutionally insufficient and therefore fatally defective" for failing to state an offense and likewise failing to put the accused on adequate notice of the nature of the charge against him, *id.* at 280–81, 567 P.2d at 1244, this court also took pains to address the constitutional prerequisite to the criminalization of "abusive language." "Speech," we declared,

> may be punishable only if, within the meaning of the statute, it is "likely to provoke a violent response." HRS § 711–1101(1)(c). What is required in the de-

scription of this conduct is *a causal relationship between the speech and the disturbance sought to be prevented. The probable effect of this type of conduct is an essential element....*

*Id.* at 282, 567 P.2d at 1245 (emphasis added). Moreover, in a footnote, we added that

> [w]hile the facts show no justification whatsoever for the defendant's conduct towards the police, the charge was improperly laid under HRS § 711–1101. See commentaries on HRS § 711–1101. *The abusive language, coupled with the outrageous physical conduct of the defendant in this case, would have warranted a charge of harassment under HRS § 711–1106.*

*Id.* at 282 n. 3, 567 P.2d at 1245 n. 3 (emphasis added).

Thus, *Jendrusch* is authority for the proposition that, for speech to be punishable under HRS § 711–1106(1)(b), there must be a "causal relationship" between the speech at issue and "the disturbance sought to be prevented"—*i.e.*, the "likelihood" of provoking "a violent response." Establishing such a "causal relationship" obviously requires an examination of the totality of the circumstances, or, put differently, the context in which the speech is uttered. It is equally obvious that the fact that the object of the speech is a trained and experienced police officer is a part of that context.[20] Where abusive speech is directed at such a police officer, it must generally be "coupled with ... outrageous *physical* conduct," *see Jendrusch*, 58 Haw. at 282 n. 3, 567 P.2d at 1245 n. 3 (emphasis added), which exacerbates the risk that the officer's training and professional standard of restrained behavior will be overcome such that the officer will be provoked into a violent response, in order to rise to the level of harassment punishable under HRS § 711–1106(1)(b); *see also State v. Faulkner*, 64 Haw. 101, 105, 637 P.2d 770, 774 (1981) ("Belligerency, when combined

---

19. *See supra* note 9.

20. *See, e.g.*, the concurring opinion of Justice Powell in *Lewis v. New Orleans*, 415 U.S. 130, 134, 94 S.Ct. 970, 973, 39 L.Ed.2d 214 (1974): [W]ords may or may not be "fighting words," depending upon the circumstances of their utterance.... [A] properly trained [police] officer may reasonably be expected to "exercise a higher degree of restraint" than the average citizen, and thus be less likely to respond belligerently to "fighting words." *Id.* at 135, 94 S.Ct. at 973 (Powell, J., concurring) (citations omitted).

with *persistently outrageous and abusive conduct, which unreasonably interferes with an officer's performance of his official duties,* may supply the basis for a charge of harassment under HRS § 711–1106.") (citing *State v. Vance,* 61 Haw. 291, 602 P.2d 933 (1979), and *State v. Hopkins,* 60 Haw. 540, 592 P.2d 810 (1979) (emphasis added)).

The constitutional approach to permissible prohibition of abusive expression, expressly set forth in the commentary to the MPC cited above and implicit in *Jendrusch* and *Faulkner,* is also echoed in the scholarly literature. For example, Professor Greenawalt has suggested the following conceptual framework, with which we agree:

> [T]he critical variables are the manner in which abusive speech is employed and the harms that it threatens. The more the abuse is meant to trigger action or inflict immediate wounds, the less its claim to protection; as harms become more grave, more clearly evident, more subject to formulation in legal language, and less dependent on the ideas that abusive words may express, the stronger the argument that the harms may be the basis for restriction....
>
> ....
>
> The common direction concerning fighting words ... has been to demand very narrowly drawn statutory language focusing on imminent violence. This direction fits comfortably with the general distaste for content-based restrictions and with the modern treatment of the hostile-audience problem, which is to insist that the first duty of government for unpalatable speech is to protect speakers....
>
> The one proposition ... on which everyone agrees is that the prevention of violence is a legitimate basis for restricting gravely abusive remarks.... [But] [w]ith what breadth is the likelihood of violence to be conceived? And how high must the likelihood be?
>
> ....
>
> ... If, ... as I have proposed, the focus should be on words and context ..., the standard should be whether, when words of that sort are spoken in that context, a substantial proportion of addressees would be provoked to violence.

*Speech, Crime, and the Uses of Language,* at 292–93, 295–96 (footnotes omitted).

We likewise consider the analyses of other jurisdictions that have reviewed criminal convictions involving the use of fighting words or abusive language directed at police officers to be persuasive. In *State v. Beck,* 9 Kan. App.2d 459, 682 P.2d 137 (1984), for example, the defendant not only hurled repeated profane and vulgar epithets at two police officers who had been called to a domestic disturbance involving the defendant, but also: (1) invited the officers to "[c]ome up here and I'll fuck with you"; (2) apparently reeked of alcohol; (3) engaged in a physical altercation with the officers; (4) spit in one of their faces; and (5) kicked and broke the taillight of one of the patrol cars.

Not surprisingly, the Kansas Court of Appeals affirmed the defendant's disorderly conduct conviction, quoting *City of St. Paul v. Morris,* 258 Minn. 467, 468–69, 104 N.W.2d 902 (1960), *cert. denied,* 365 U.S. 815, 81 S.Ct. 696, 5 L.Ed.2d 693 (1961), for the proposition that " 'there is no sound reason why [police] officers must be subjected to indignities ... that go far beyond what any other citizen might reasonably be expected to endure.' " 9 Kan.App.2d at 462, 682 P.2d at 140. We have no quarrel with this proposition, particularly in light of the fact that the defendant's conviction was far from one "resting solely upon 'speech' " or in which the "communicative utterances which [were] the subject of prosecution ... constitute[d] the sole form of behavior for which the defendant was being prosecuted." *Cf. Cohen v. California,* 403 U.S. 15, 18–19, 91 S.Ct. 1780, 1784–85, 29 L.Ed.2d 284, *reh'g denied,* 404 U.S. 876, 92 S.Ct. 26, 30 L.Ed.2d 124 (1971); *Anniskette,* 489 P.2d at 1013.

But even given the egregious record before it, the *Beck* court acknowledged that the defendant's culpability depended "upon the totality of the circumstances in [the] given case. Where language is involved, the fact that the addressee is a police officer is only one factor to be considered." 9 Kan.App. at 462, 682 P.2d at 140. That the addressee's status as a police officer was "only one"

factor to be considered, however, does not obscure the fact that it was still a "factor to be considered" in light of "the totality of the circumstances." *See id.*

*John W., supra*, more closely approximates the matter before us, although, as the facts demonstrate, it is still more extreme. In that case, the defendant, a minor, protested the disorderly conduct arrest of his older sister after the car in which they were driving was stopped by the police. Receiving no satisfactory explanation of the arrest despite his repeated demand to be advised "what the hell is going on," the defendant ordered the retreating officer to "turn around and come back here" and pronounced him a "fucking pig" and a "fucking kangaroo." The officer ordered the defendant back into his car, and the defendant hollered, "Fuck you." The defendant was arrested and subsequently convicted of "disorderly conduct arising out of verbal abuse of a police officer."

█ The Supreme Judicial Court of Maine reversed the defendant's conviction. Its analysis, which we adopt, merits quotation at length:

> When dealing with fighting words there is a legitimate governmental interest in preventing words "which by their very utterance inflict injury or tend to incite an immediate breach of the peace," [quoting *Chaplinsky*] but language which is merely distasteful cannot be punished. Application of a criminal statute must be restricted "to a kind of speech that produces or is likely to produce a clear and present danger of substantive evils that [the state] constitutionally may seek to prevent." ...
>
> . . . .
>
> ... *Chaplinsky* ... did not make certain words punishable whenever and wherever they were used. On the contrary, the opinion plainly contemplated that courts enforcing ... statutes must look to the actual situation in which the words were used, in order to punish only words which, when they were used, were "plainly likely" to cause a breach of the peace.... It is clear [the statute] requires that fact finders look to the specific context in which words were spoken. Fact finders need not look to the subjective response of the actu-

al addressee, but they must consider the *situation* of the addressee. In particular, the fact finder must consider those personal attributes of the addressee which were reasonably apparent because those attributes are a part of the objective situation in which the conduct occurred.

> . . . .
>
> ... We base our interpretation of [the statute], as applied in this case, on a minimum requirement that words which are not objectively likely to cause a breach of the peace, in the situation in which they are used, are not fighting words and may not be punished under either the [f]ederal or the [state] [c]onstitution[s].
>
> . . . .
>
> In the present case, the person taunted or insulted was a police officer.... We presume that a police officer would not so readily respond violently to conduct of the sort engaged in by [the defendant]. To constitute a violation of the statute in these circumstances the conduct must be egregiously offensive, so offensive as to have a direct tendency to cause a violent response even from a police officer....
>
> . . . .
>
> ... Abuse "far beyond what any other citizen might reasonably be expected to endure" [quoting *City of St. Paul v. Morris*] need not be endured by the police. But epithets directed at police officers are not fighting words merely because they might be so if directed at some other person. The nature of the experience, training and responsibilities of police officers must be considered in determining whether a given defendant's language constituted fighting words.
>
> . . . .
>
> ... We do not condone or encourage abusive language, but even crude speech may be entitled to constitutional protection.... The right to remonstrate against a police intrusion into our activities is one element which distinguishes our democratic society from the police state....

418 A.2d at 1102, 1104, 1106–07 (footnotes and citations omitted and emphasis in original).

.

Perhaps the decision most closely analogous to the matter at hand is *Nelson, supra,* in which a state police officer on patrol duty in a high crime area observed the defendant walking along a road. The officer stopped the defendant in order to ascertain his identity. The defendant "responded by turning toward the officer, coming to a position of military attention and saluting the officer." *Nelson,* 38 Conn.Supp. at 350, 448 A.2d at 216. Responding to the officer's queries, the defendant indicated that he was coming from "[u]p the road" and that he was going "[d]own the road." *Id.* When asked for identification, he claimed to have none in his possession. Although the defendant ultimately identified himself as a person whom the officer recalled having arrested in the past, he was moved to ask the officer why he was being "hassled." *Id.* The defendant responded to further questioning by advising the officer that he was a "fucking asshole" and a "fucking pig." *Id.* & n. 1. When the defendant delivered further "vituperations" at the officer, he was arrested for "breach of the peace." *Id.* The trial court convicted him of the offense.

 The *Nelson* court reversed the defendant's conviction, ruling as follows:

A significant circumstance here is that the defendant's remark was addressed to a police officer rather than to some member of the public. "But the situation may be different where such words are addressed to a police officer trained to exercise a high degree of restraint than the average citizen." *Lewis v. New Orleans,* 408 U.S. 913, 914, 92 S.Ct. 2499, 2500, 33 L.Ed.2d 321 (1972) (Powell, J., concurring). . . . [P]olice officers['] . . . training and experience should make them more thick-skinned than ordinary citizens. . . . [There is] also a reluctance to confer upon police "a virtually unrestrained power to arrest and charge persons with a violation . . . where there is no other valid basis for arresting an objectionable or suspicious person" [quoting Powell, J., concurring in *Lewis v. New Orleans* and citing *John W.*]. . . . Inso-

lence and vulgarity are not crimes and enforcing better standards of social deportment is not the business of police officers,[21] whose full attention should be occupied with matters of greater public concern. It is not a choice open to us whether it would be wiser to approve such arrests as a kind of safety valve for the bruised feelings of an officer who has been subject to abusive language and, frustrated from other remedy, may be more inclined to resort to violence. That decision has been made by the constitutional guaranty of freedom of speech, which tolerates no restraint upon verbal expression applicable to this case except for words "which tend to trigger an immediate violent reaction." [Citation omitted.]

The words used by the defendant are similar to other uncouth utterances aimed at police officers which have been found to fall outside this narrow "fighting word" exception. [Citations omitted.] There were no special circumstances here, such as threatening actions or the presence of persons other than the officers whom the words might have incited, which imparted to the unadorned language itself any additional provocative overtone. We are constrained to conclude that the evidence presented was insufficient as a matter of law to prove . . . that the defendant's coarse words were sufficiently inflammatory to arouse retaliatory violence by the only person who heard them.

38 Conn.Supp. at 354–55, 448 A.2d at 217–18 (emphasis added). *Cf. State v. Brown,* 62 N.J. 588, 303 A.2d 886 (1973) ("disorderly person" conviction affirmed where defendant, who was present at public Board of Education meeting attended by over two hundred people, became abusive and told police officer, "I'll kick the shit out of you, you mother fucker—remember you work for me—you take that badge off and I'll kill you.")

 We are unable to distinguish the present matter from *Jendrusch, Faulkner, John W.,* and *Nelson,* and regard it as completely distinguishable from *Beck* and

---

**21.** "I start with the obvious proposition that a legislature could not create a crime of 'antisocial communication,' which would penalize communication that offended or generated other noncriminal harms." K. Greenawalt, *Speech, Crime, and the Uses of Language* 288 (1989).

*Brown*.[22] When the Minor, a fifteen-year-old youth of slight build, directed his "challenge" to Officer Mariani, a much larger individual and a veteran of the Honolulu Police Department, the Minor was located within his home in the sole presence of his mother; Officer Mariani, by contrast, was positioned outside of the front door of the home. According to the district family court's own FOF, Officer Mariani arrested the Minor for harassment *solely* in "reaction" to the Minor's "sarcastic, disrespectful, and vulgar" conversation with the Minor's mother and the Minor's unresponsiveness to Officer Mariani's admonition to the Minor "that he should not speak to his mother in that fashion." FOF Nos. 9 and 10. By his own testimony, Officer Mariani effected the arrest "to avoid any further confrontation," presumably between the Minor and his mother. 2/3/92 Tr. at 11. There is no evidence that the Minor's mother was likely to be provoked to a violent response and, in any event, the complaint charged the Minor only with provoking Officer Mariani. It may well be that the Minor's "challenge" to Officer Mariani's authority (whatever the Minor's state of mind may have been in issuing it) was "the straw that broke the camel's back" and precipitated the Minor's arrest. Nevertheless, it is apparent from the record, in light of the totality of the circumstances, that Officer Mariani was not likely to be provoked to a violent response thereby.

We hold that the evidence contained in the record before us fails, as a matter of law, to establish a causal relationship between the Minor's speech at issue and the disturbance sought to be prevented by HRS § 711–1106(1)(b)—the likelihood of provoking Officer Mariani to a violent response.

22. *Brown* is distinguishable from the present matter for at least two reasons. First, the defendant in *Brown* was arrested for having committed New Jersey's version of disorderly conduct, rather than harassment. In this connection, it is significant that Brown uttered his "course utterances" and "abusive language," *see* HRS § 711–1101(1)(c), at a public meeting in the presence of more than two hundred people, whereas the Minor issued his "challenge" to Officer Mariani within the confines of his home in the sole presence of his mother. Thus, considering "the totality of the circumstances, or, put differently, the context in which the speech is uttered," *see supra* at 1315–1316, the "risk of public inconvenience or alarm," *see* commentary on HRS § 711–1106,

## III. *CONCLUSION*

▆ Because, whatever his intent may have been, the Minor's challenge to Officer Mariani was not uttered in a manner likely to provoke a violent response on the officer's part, we hold as a matter of law that there was insufficient evidence to support the district family court's conclusion that the Minor committed the offense of harassment, in violation of HRS § 711–1106(1)(b). Accordingly, we reverse the district family court's amended findings, order, and decree adjudging the Minor a law violator and remand for the entry of an order dismissing the petition.

NAKAYAMA and RAMIL, JJ., concur.

KLEIN, Justice, concurring, with whom MOON, C.J., joins.

The majority correctly reverses the Minor's conviction for the offense of harassment in violation of HRS § 711–1106(1)(b) (Supp. 1992). I concur separately, solely because there is insubstantial evidence in the record from which a reasonable fact finder could conclude, beyond a reasonable doubt, that the Minor's challenge to Office Mariani was issued "in a manner likely to provoke a violent response." If the Minor's contentions on appeal are that the evidence fails to prove his guilt beyond a reasonable doubt and, at any rate, that the criminal statute unconstitutionally infringes upon the Minor's rights of free speech, ordinary analysis only requires that we assess the substantiality of the evidence in the case. *State v. Kam*, 68 Haw. 631, 635, 726 P.2d 263, 266 (1986).

at 273, present in *Brown* was a real one. The risk of public inconvenience or alarm is precisely the harm that HRS § 711–1101, the Hawai'i disorderly conduct statute, was designed to avoid. *Id.* The second distinction is the extremely abusive nature of Brown's remarks to the police officer as compared to the Minor's invitation to Officer Mariani to take off his gun and badge, which was akin to a query as to whether Officer Mariani would "like beef" (*i.e.*, "invitation to go outside"). *See* D. Simonson, K. Sakata, and P. Sasaki, *Pidgin to Da Max* (1981). As we hold *infra* at 1319, on the record before us, the latter created no likelihood of provoking Officer Mariani to a violent response.

I find the balance of the majority's thorough analysis of the constitutional implications of criminalizing speech interesting reading yet somewhat inconclusive with respect to the constitutionality of HRS § 711–1106(1)(b) either facially or as applied to the actions of the Minor.

In addition, I disagree with the majority's assessment that the

> district family court's own FOF [show] that Officer Mariani arrested the Minor for harassment *solely* in "reaction" to the Minor's "sarcastic, disrespectful, and vulgar" conversation with the Minor's mother and the Minor's unresponsiveness to Officer Mariani's admonition to the Minor "that he should not speak to his mother in that fashion." FOF Nos. 9 and 10.

Majority at 1319 (emphasis in original). If this were true, the Minor would have been arrested at the point of Officer Mariani's admonishment. That the Minor was not arrested, and that he could not have been arrested at that point because he had committed no illegal act, belies the notion that Officer Mariani effectuated the Minor's arrest solely to enforce a breach of etiquette. If that had been the basis for the arrest, we would not be writing today.

Next, the majority presumes that it was the mother-son argument that Officer Mariani was referring to when he testified that he arrested the Minor "in order to avoid further confrontation". Majority at 1319. More plausible, however, is the view that Officer Mariani arrested the Minor to avoid any further confrontation between *Officer Mariani and the Minor* that might have escalated into a violent response by either. Because it was the challenge to Officer Mariani that established the elements of the offense of harassment, the *majority ought to have concluded that it was the Minor's challenge that led to his arrest.

The majority utilizes its reasoning to bolster the conclusion that "the evidence contained in the record before us fails, as a matter of law, to establish a *causal relationship* between the Minor's speech at issue and the disturbance sought to be prevented by HRS § 711–1106(1)(b)—the likelihood of provoking Officer Mariani to a violent response." Majority at 1319 (emphasis added).

Unlike the crime of Disorderly Conduct as set forth in HRS § 711–1101(1)(c) (1985), harassment does not require proof of a causal link between conduct and response. *Compare* HRS § 711–1101(1)(c) *with* HRS § 711–1106(1)(b). Be that as it may, there is still no evidence to prove, and much to disprove, that the Minor's challenge was likely to provoke a violent response from Officer Mariani. Therefore, the Minor's conviction is properly reversed.