881 P.2d 1264

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Charles Brooks TALIFERRO, Defendant–Appellant.**

**No. 16642.**

Intermediate Court of Appeals of Hawai'i.

Sept. 29, 1994.

---

Donald L. Wilkerson, Deputy Public Defender, on the briefs, Honolulu, for defendant-appellant.

Janet R. Garcia, Deputy Prosecuting Atty., County of Hawai'i, on the brief, Hilo, for plaintiff-appellee.

Before HEEN, WATANABE and ACOBA, JJ.

WATANABE, Judge.

Defendant–Appellant Charles Brooks Taliferro (Defendant) appeals from the November 13, 1992 judgment and sentence of the District Court of the Third Circuit, convicting him of harassment, in violation of Hawai'i Revised Statutes (HRS) § 711–1106(1)(b) (1985).[1] We reverse.

## BACKGROUND

The charge against Defendant stemmed from an incident which occurred on June 20, 1992. What actually transpired that day, however, was the subject of much dispute at trial.

According to Defendant, he was taking a bath earlier that morning when he heard a noise out on the road fronting his house. He got out of the tub, stood up on a chair, and saw a man and a woman standing on the road, accompanied by three large dogs which were relieving themselves on Defendant's front lawn. Although Defendant yelled at the dogs' owners, Ken Brown (Brown) and Helen Bridge (Bridge), his complaints were ignored. Angered by the action of the dogs and their owners, Defendant dried himself

---

1. Hawai'i Revised Statutes (HRS) § 711–1106(1)(b) (1985) provides:

(1) A person commits the offense of harassment if, with intent to harass, annoy, or alarm another person, he:

\* \* \* \* \* \*

(b) Insults, taunts, or challenges another person in a manner likely to provoke a violent response[.]

off, dressed, went outside, picked up the dog feces with a thin paper, and carried it to Brown's house, which was located across the street and two houses away from Defendant's.

On his way to Brown's house, Defendant observed a woman, who he claimed was not Bridge, drive past him towards Brown's house in a station wagon. That woman was standing outside her parked car in Brown's driveway when Defendant reached Brown's property. Defendant claims that by this time, the feces had begun to leak through the paper and had gotten on his hands. He consequently dropped the feces on Brown's driveway near the road and wiped his hands on the grass. Bridge then appeared, and Brown "came outside," called Defendant a "Fool N–I–G–G–E–R," and threatened him. Transcript (Tr.) 10/29/92, at 13–14. Defendant responded by telling Brown that he "wasn't going to take any more of it because they had brought the dogs down there before in the past, and [he] had seen them walking away." *Id.* at 14.

Bridge's testimony at trial was substantially different. She testified that she had gone to the bank on the day in question and was returning home in her car when she saw Defendant yelling and waving his fist at her as she passed his house. When she drove her car into the driveway of Brown's house, where she lived, she immediately yelled for Brown, her boyfriend, and explained to him what she had just witnessed. She turned around just in time to hear Defendant yell something about her dogs and see Defendant throw the feces at her from a distance of about seven feet. Defendant then wiped both of his hands on the grass on Brown's property.

Brown testified that he saw Defendant "run up to [Brown's] driveway," Tr. 10/12/92, at 32, and throw something at Bridge, which he discovered later was dog feces. Defendant screamed something like, "Your dogs are down my road," *id.* at 34, and when he

threw the feces, most of it fell apart and either hit Defendant in the head or dropped right in front of Defendant. Brown added further that "it didn't hit [Bridge], but it came . . . in that direction." *Id.* Brown also testified that after Defendant threw the feces, Defendant left and "went back, I guess, to his land[.]" *Id.*

Defendant was subsequently arrested, charged, and found guilty of harassment, in violation of HRS § 711–1106(1)(b).

The trial court, in convicting Defendant, explained its ruling as follows:

> All right. Court's ready to rule. After consideration of all the evidence, the testimony, the Court finds that the State has proven beyond a reasonable doubt each and every element of the charge of harassment.
>
> I will say that with respect to credibility of the witnesses, I found Miss Bridge to be highly excitable.
>
> And that although it's—it's my recollection is that she did answer a very specific question as to how many dogs she owned, her subsequent responses to questions would have led me to believe that she not only owned one dog but walked only one dog and used to walk that dog everyday [sic] when, in fact, it appears that that was somewhat disingenuous.[2]
>
> I do not believe that the incident occurred as Miss Bridge and Mr. Brown—well, Miss Bridge described it. I don't think [Defendant] is capable of running 400 feet after a vehicle. Four hundred feet is longer than the length of a football field, and it's obvious that [Defendant] is, in fact, disabled.[3]
>
> However, I also don't believe that [Defendant], given his state of mind at the time as he describes it, went to the Brown property and, uh, to—to drop it in Mr. Brown's—to drop the poop in Mr. Brown's

---

**2.** At trial, Bridge testified that she only owned one dog, thus implying that the three dogs which had gone onto Defendant's property belonged to someone else. Evidence was subsequently adduced, however, that Brown also owned two dogs. Transcript (Tr.) 10/29/92, at 18.

**3.** At trial, Defendant testified that all ten of his toes had been amputated and he was therefore unable to run. Tr. 10/29/92, at 12.

yard. That I believe that the actions that he took were intentional.

As defined by the statute, "intention" is one—is when it is his conscious object to engage in that conduct. He consciously picked up the poop, deliberately walked over to the property, and deliberately either dropped or flew feces at the Brown property.

The picture is somewhat enlightening in that the poop does not appear, at least as identified in this picture as poor as it is, was not thrown into the yard but, in fact, appears—some of it appears on the driveway. And that's what leads me to believe that there's a discrepancy on both parts as to what happened with the, uh, the poop.

When you do that, take that kind of action, [Defendant], somebody's going to get mad, you know. Whether you drop it on his property or you throw it at them, somebody's gonna get mad, and it—it—in my mind I think a finding of not guilty in this situation would do you a greater disservice than finding you guilty.

Tr. 10/29/92, at 26–28 (footnotes added).

This timely appeal followed.

Defendant alleges that his conviction should be reversed because: (1) the trial court violated his constitutional rights by failing to adequately inform him of the charge against him; (2) the trial court violated his due process rights when it found him guilty merely to avoid the "greater disservice" of finding him not guilty; (3) there was insufficient evidence for the trial court to convict him of harassment; and (4) Defendant's conduct toward Bridge was *de minimis.*

We agree with Defendant that the evidence offered at trial was insufficient to convict him of harassment, in violation of HRS § 711–1106(1)(b). Accordingly, we find it un-

necessary to consider Defendant's other arguments on appeal.

## DISCUSSION

■■■ Since Defendant was charged with committing harassment, in violation of HRS § 711–1106(1)(b) (1985),[4] the State was required to prove, beyond a reasonable doubt, three material elements of the offense: (1) that Defendant insulted, taunted, or challenged Bridge (i.e., the prohibited conduct); (2) that Defendant did so in a manner likely to provoke a violent response on Bridge's part (i.e., the probable result of the prohibited conduct); and (3) that Defendant did so with intent to harass, annoy, or alarm Bridge (i.e., the requisite state of mind). *In re John Doe,* 76 Hawai'i 85, 92, 869 P.2d 1304, 1311 (1994).

■■■ The ultimate issue we must determine on appeal, therefore, is "whether, as a matter of law, the prosecution failed to prove any of these three elements." *Id.* Determination of this issue requires an examination of the legal sufficiency of the evidence adduced at trial. *Id.* In this regard, the Hawai'i Supreme Court has instructed that

[o]n appeal, the test for a claim of insufficient evidence is whether, viewing the evidence in the light most favorable to the State, there is substantial evidence to support the conclusion of the trier of fact. *State v. Ildefonso,* 72 Haw. 573, 576, 827 P.2d 648, 651 (1992); *State v. Tamura,* 63 Haw. 636, 637, 633 P.2d 1115, 1117 (1981). " 'It matters not if a conviction under the evidence as so considered might be deemed to be against the weight of the evidence so long as there is substantial evidence tending to support the requisite findings for the conviction.' " *Ildefonso,* 72 Haw. at 576–77, 827 P.2d at 651 (quoting *Tamura,* 63 Haw. at 637, 633 P.2d at 1117). " 'Substantial evidence' . . . is credible evi-

---

4. We note that after Defendant had been arrested in this case, HRS § 711–1106(1)(b) was amended, effective June 29, 1992, to read:

(1) A person commits the offense of harassment if, with intent to harass, annoy, or alarm another person, that person:

\* \* \* \* \* \*

(b) Insults, taunts, or challenges another person in a manner likely to provoke an imme-

diate violent response or which would cause the other person to reasonably believe that the actor intends to cause bodily injury to the recipient or another, or damage to the property of the recipient or another[.]

dence which is of sufficient quality and probative value to enable a [person] of reasonable caution to reach a conclusion.'" [sic] *See id.* at 577, 827 P.2d at 651 (quoting *State v. Naeole*, 62 Haw. 563, 565, 617 P.2d 820, 823 (1980)).

*State v. Silva*, 75 Haw. 419, 432, 864 P.2d 583, 589–90 (1993) (quoting *State v. Matias*, 74 Haw. 197, 207, 840 P.2d 374, 379 (1992)). Further, in reviewing whether substantial evidence exists to support a conviction, due deference must be given to the right of the trier of fact to determine credibility, weigh the evidence, and draw justifiable inferences of fact from the evidence adduced. *State v. Naeole*, 62 Haw. 563, 565, 617 P.2d 820, 823 (1980).

██ Applying the foregoing standard, we conclude that sufficient evidence exists that Defendant acted on the day in question with the requisite intent to either harass, annoy, or alarm Bridge. Defendant admitted that he was angry that dog feces had been left in his yard. His anger prompted him to pick up the feces and walk to Brown's property, with the intention of returning to the dogs' owners what he felt belonged to them. Such evidence was sufficient to prove that Defendant, at the very least, intended to annoy Bridge.

We conclude, however, that the record does not support a finding that Defendant either insulted, taunted, or challenged Bridge, or that Defendant did so in a manner likely to provoke a violent response.[5]

HRS § 711–1106(1)(b) is patterned after section 250.4(2) of the Model Penal Code (MPC). The commentaries to this model section state:

[Section 250.4(2)] reaches intentional harassment by utterance of fighting words. It is an offense under this provision to insult, taunt, or challenge another "in a

manner likely to provoke violent or disorderly response." There is authority stating that the common law recognized a misdemeanor of challenging another to fight or attempting to provoke another to give such challenge. The first English codification on this subject was the Public Order Act of 1936, which proscribed in terms not unlike those of the Model Code use of "threatening, abusive or insulting words ... with intent to provoke a breach of the peace or whereby breach of the peace is likely to be occasioned."

\*    \*    \*    \*    \*    \*

The paradigm case covered by [Section 250.4(2)] is the intentional utterance of words so assaultive of personal dignity that they are likely to provoke physical retaliation against the speaker. It is the prospect of violence and disorder that the provision seeks to avoid and not merely unwelcome or unfriendly conversation. The scope of the offense must be determined in light of its underlying purpose to prohibit speech that is likely to precipitate unlawful action. ... The words so directed must be sufficiently offensive to raise a probability of physical retaliation by the addressee or someone acting in his interest. Whether such likelihood exists is determined objectively.

*Model Penal Code and Commentaries*, § 250.4(2), at 364–65 (1980) (footnotes and citations omitted).

██ It is thus clear that to constitute the offense of harassment in violation of HRS § 711–1106(1)(b) (1985), the words or conduct of a defendant must be so offensive that they are likely to provoke an immediate[6] physical retaliation against the defendant by the addressee or someone acting in the addressee's interest. It is not enough that a defendant's words or conduct merely arouse anger or

---

**5.** As for any insult, taunt, or challenge to Brown, Defendant was not charged with harassment of Brown.

**6.** *See also In re Doe*, 76 Hawai'i 85, 91–92, n. 10, 869 P.2d 1304, 1310–11, n. 10 (1994), where the Hawai'i Supreme Court observed that when the legislature amended HRS § 711–1106(1)(b) in 1992 to require that the "insult, taunt, or chal-

lenge" for harassment purposes be uttered "in a manner likely to provoke an *immediate* violent response," (inserted language underscored) "the legislature intended the 'immediacy' of the violent response to be a 'technical, nonsubstantive change.'" In view of the legislative assumption that the immediacy requirement had always been present in the statute, the supreme court applied the requirement to the 1985 version of HRS § 711–1106(1)(b).

resentment. Furthermore, in reviewing whether a defendant's words or conduct constituted harassment, the relevant test is objective, not subjective. *In re Doe*, 7 Haw. App. 582, 584, 788 P.2d 173, 175 (1990).

In this case, the only words that Defendant apparently uttered to Bridge related to his disgust that Bridge's and Brown's dogs were constantly leaving unwelcome droppings in Defendant's yard. There is no evidence that Defendant insulted or taunted Bridge in any way, or that he challenged Bridge to a fight or provoked her into an act of violence or physical retaliation. Indeed, Brown testified that none of the dog feces hit or touched Bridge. Furthermore, the undisputed evidence was that Defendant left Brown's property as soon as he had dropped or thrown the dog feces. Although Defendant's actions on the day in question were, as the trial court stated, likely to make somebody mad, we cannot conclude that such actions were likely to provoke a violent response so as to amount to a violation of HRS § 711–1106(1)(b) (1985).[7]

Reversed.

---

7. Our conclusion in this case is limited to an application of HRS § 711–1106(1)(b) (1985) and does not address whether Defendant could have been found guilty under amended HRS § 711–1106(1)(b) (Supp.1992). See footnote 4 for text of amended version of the statute.