**Electronically Filed
Supreme Court
SCWC-17-0000386
26-AUG-2019
08:02 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI‘I

---o0o---

STATE OF HAWAI‘I,
Petitioner/Plaintiff-Appellee,

vs.

BURT CALAYCAY, aka Burt F. Calaycay,
Respondent/Defendant-Appellant.

SCWC-17-0000386

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-17-0000386; CASE NO. 1DCW-15-0001327)

AUGUST 26, 2019

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY RECKTENWALD, C.J.

This case requires us to consider the circumstances under which sexually explicit comments can constitute harassment, pursuant to Hawai‘i Revised Statutes (HRS) § 711-1106(1)(f) (2014). Defendant Burt Calaycay was charged with harassment as a

result of statements that he allegedly made to Complaining Witness (CW).  At the time of the incidents in question, Calaycay was serving in a supervisory role at a residential program for at-risk youth.  CW was a 17-year-old participant in the program.

At trial, CW testified that on two separate occasions, Calaycay made sexually explicit comments to her that caused her to feel uncomfortable, unsafe, and scared.  She did not, however, explicitly state that she believed Calaycay intended to cause her bodily injury.  The District Court of the First Circuit (district court) found CW's testimony to be credible, determined that Calaycay's statements caused CW to believe that Calaycay intended to have non-consensual sexual contact with her, and convicted Calaycay of harassment.[1]  The Intermediate Court of Appeals (ICA) concluded that there was no evidence that CW reasonably believed Calaycay intended to cause her bodily injury - an essential element of the offense charged - and accordingly, reversed Calaycay's conviction.

For the reasons set forth herein, we reverse the ICA's Judgment on Appeal and affirm the district court's Final Judgment convicting Calaycay of harassment.

## I.  BACKGROUND

The Youth Challenge Academy (Academy) is a five-month residential program designed to help at-risk youth earn a General

---

[1]     The Honorable Alvin K. Nishimura presided.

2

Education Development credential (GED). These youth, referred to as cadets, are supervised by members of the National Guard, referred to as cadres. Cadres may discipline cadets for breaking the Academy's rules or failing to obey orders by subjecting them to screaming and requiring them to perform physical exercises, including push-ups, sit-ups, jumping jacks, and flutter kicks. In the fall of 2013, Calaycay was a cadre at the Academy and CW was a cadet. Calaycay was 28 years old at the time. CW was 17 years old.

As set forth below, due to allegations arising out of Calaycay's interactions with CW "[o]n or about the 25th day of October, 2013, to and including the 1st day of November, 2013," Calaycay was charged by way of complaint with one count of harassment in violation of HRS § 711-1106(1)(b) and/or HRS § 711-1106(1)(f).[2]

_____

[2] Harassment is prohibited pursuant to HRS § 711-1106(1), which provides, in pertinent part:

> A person commits the offense of harassment if, with intent to harass, annoy, or alarm any other person, that person:
>
> . . . .
>
> (b) Insults, taunts, or challenges another person in a manner likely to provoke an immediate violent response or that would cause the other person to reasonably believe that the actor intends to cause bodily injury to the recipient or another or damage to the property of the recipient or another;
>
> . . . .
>
> (f) Makes a communication using offensively coarse

(continued...)

**A.    Pre-trial Motion to Compel Election or to Dismiss Complaint**

Calaycay filed a Motion to Compel Election or to
Dismiss Complaint, arguing that the Complaint improperly charged
him for two separate offenses, under two respective subsections
of HRS § 711-1106(1), in a single count, in violation of Hawai'i
Rules of Penal Procedure (HRPP) Rule 8(a).[3]  Calaycay requested
that the district court order the State of Hawai'i to elect which
subsection of HRS § 711-1106(1) it wished to proceed under, or in
the alternative, dismiss the Complaint.

The district court determined that the State was
pursuing a single charge, rendering HRPP Rule 8 inapplicable.
Accordingly, it denied Calaycay's Motion to Compel Election or to
Dismiss Complaint and allowed the case to proceed to trial.

**B.    Bench Trial**

The district court held a bench trial at which CW and
Calaycay testified.  No other witnesses were called and no other

_____

[2](...continued)
    language that would cause the recipient to reasonably
    believe that the actor intends to cause bodily injury
    to the recipient or another or damage to the property
    of the recipient or another.

[3]    HRPP Rule 8(a) provides:

    Two or more offenses may be joined in one charge, with
    each offense stated in a separate count, when the
    offenses:

    (1)    are of the same or similar character, even if
           not part of a single scheme or plan; or

    (2)    are based on the same conduct or on a series of
           acts connected together or constituting parts of
           a single scheme or plan.

evidence was offered.

### 1. CW's Testimony

CW testified that in Fall 2013, she was a 17-year-old cadet at the Academy. At around 6:00 p.m. on October 25, 2013, CW was in an open exercise field enjoying free time with her peers when Calaycay asked her to talk to him away from the other cadets and cadres. CW stated:

> He [told] me he wanted to have sex with me and he wanted to get me wet and hit me from the back and have me ride him and that his - it will be okay and he'll take me to the - the third floor and we could have sex in the - in the - where the cadres stay and that his team had his back and that I wouldn't get in trouble.

CW explained that she thought Calaycay was referring to all the other cadres when he said "his team had his back." CW further testified that Calaycay's statements made her feel uncomfortable because she "didn't know what to do, and it was just weird." Calaycay's statements made her feel unsafe because she "didn't have [her] mom there," and scared because she "didn't have anyone." She also felt sad and depressed.

CW testified that at around 9:30 p.m. on November 1, 2013, she was awoken by Calaycay "calling [her] from the side of [her] window." She stated, "he called me out of my bunkers,[4] and he was telling me how beautiful I was and how he wanted to hook up with me and how he wanted to see me naked." CW testified that this made her feel uncomfortable and unsafe.

_____

[4] The term "bunkers" refers to the cadets' dormitory.

CW stated that during the aforementioned incidents, Calaycay never physically touched her. He spoke softly, did not appear angry, and did not threaten her. The following exchange transpired on cross-examination:

    Defense Counsel:  When he said he wanted to lick you, okay, what
                      did you understand that to mean, that he wanted
                      to give you dirty lickins and beat you up?

                 CW: No.

    Defense Counsel:  What did you believe -

                 CW: In a sexual way.

    Defense Counsel:  And what would that be in a sexual way?

                 CW: With his - licking me with his tongue.

    Defense Counsel:  I see.  And when you indicated that - testified
                      that he wanted to hit you from the back, what
                      did you believe that - what he meant by that?

                 CW: Fuck me from the back.

    Defense Counsel:  What's that?

                 CW: Fuck me from the back.  That's what he was -

    Defense Counsel:  Have sex with you from the back?

                 CW: Yes.

    Defense Counsel:  Okay.  Did he threaten to hurt you physically?
                      Like beat you up?

                 CW: No.

    Defense Counsel:  Did you feel like he - when he said he wanted to
                      lick you, did you believe that it was your
                      impression that he was trying to tell you that
                      he was gonna hurt you or have you experience
                      sexual pleasure?

                 CW: Sexual pleasure.

(Emphases added).

CW admitted that she had been disciplined for sniffing pills prior to these encounters with Calaycay. CW also testified that on a previous occasion, another cadre, Cadre Jarvis, had her take off her clothes so that he could search her with only her panties on. She reported this incident to her supervising cadre.

Although CW told her friends about Calaycay's statements, she did not tell her supervising cadre or otherwise report Calaycay's behavior. The Deputy Prosecuting Attorney (DPA) questioned CW as follows:

> DPA: Why did you only tell your friends and not anyone else when it first happened?
>
> CW: I was scared.
>
> DPA: Why were you scared?
>
> CW: Because I didn't know what would happen to me if I wouldn't be able to graduate or -
>
> DPA: What happens if you don't graduate?
>
> CW: I don't get a GED, and I would be in there for nothing.
>
> DPA: Do the cadres have any input as to whether you graduate or not?
>
> CW: Yes.
>
> DPA: You mentioned when [Defense Counsel] was asking you questions that <u>you thought the defendant intended to, and correct me if I'm misstating, subject you to sexual pleasure</u>?
>
> CW: <u>Yes</u>.
>
> DPA: <u>And that made you uncomfortable</u>?

7

```
CW:    Yes.

DPA:   And that made you scared?

CW:    Yes.

DPA:   And that made you feel unsafe?

CW:    Yes.

DPA:   And he did so on two occasions between October
       25th and November 1st?

CW:    Yes.
```

(Emphases added).

### 2.    Motion for Judgment of Acquittal

Following the conclusion of CW's testimony, Calaycay made an oral Motion for Judgment of Acquittal on the grounds that CW's testimony did not "support the elements that [Calaycay] insulted, taunted, or challenged [CW] in a manner that . . . would cause her to reasonably believe [Calaycay] intended to cause her bodily injury," and further, that "the allegedly coarse language that was allegedly used did not cause [CW] to reasonably believe that [Calaycay's] acts were intended to cause her bodily injury."

The district court denied Calaycay's motion, as the language Calaycay allegedly used "could be construed to be insulting or offensively coarse" and CW "could certainly believe from that language that [Calaycay] intended to cause bodily injury to her."  The district court further determined that "nonconsensual sex can be construed to be causing bodily injury

8

to the other person."

### 3. Calaycay's Testimony

Calaycay testified that in 2013, he was a 28-year-old cadre at the Academy, assigned to supervise the first platoon of male cadets. Calaycay did not reside on Academy property, but rather, returned home when he was not working. Prior to serving as a cadre at the Academy, Calaycay deployed to Iraq for two tours as a member of the National Guard. Calaycay testified that he had disciplined CW on at least one occasion.

Calaycay stated that, prior to the interactions at issue, he heard that CW had accused Cadre Jarvis of "touching her in the [wrong] place." He also knew CW was one of several cadets who were caught sniffing pills. Calaycay testified that, prior to his conversation with CW on the exercise field, he saw Cadre Jarvis discipline CW and the other cadets by requiring them to do push-ups, sit-ups, flutter kicks, and jumping jacks. He admitted that he did not actually see CW sniffing pills and was not present when Cadre Jarvis searched her, so he did not know for sure what happened during either incident.

Calaycay stated that he spoke with CW on October 25, 2013, because she looked sad and depressed. He explained:

> I . . . took her on the side right where the kids were, I spoke to her asking her what was wrong with her, so she told me about she was sad, that, you know, all that sniffing pills, that she might get kicked out and all that stuff. And then I told her that you know the consequences of sniffing the pills, overdose, you know, maybe get kicked out of the academy, and I told

her just keep your head up, you know, try not for do
that again.

Calaycay denied saying anything of a sexual nature to CW during this conversation. He did not tell CW that he wanted to have sex with her, that he wanted to lick her, or that he wanted to hit her from the back.

Calaycay stated that he knew where CW "was particularly housed" and stated "her room is like right where the camera is." Calaycay further testified that he knew which areas were captured by security cameras and which areas were not.[5] He denied going to CW's dormitory and calling her outside to talk, and stated that on November 1, 2013, he "went home" and "never came back."

### 4. Conviction and Sentence

The district court found CW's testimony to be credible. It also determined that Calaycay intended to harass, annoy, or alarm CW, and that his statements were insulting under HRS § 711-1106(1)(b) and constituted offensively coarse language under HRS § 711-1106(1)(f). Noting the fact that Calaycay "was in a supervisory capacity," or had "some level of control over" CW, and that CW was "in a setting where she's not really free to leave," the district court further found that CW "reasonably believed that [Calaycay] intended to cause bodily injury to her."

Accordingly, the district court found Calaycay guilty of harassment. The district court postponed sentencing to allow

---

[5]     No security camera footage was admitted into evidence.

10

defense counsel additional time to file a Motion for Reconsideration.

### a. Motion for Reconsideration

Calaycay filed a Motion for Reconsideration, arguing that the district court's verdict was "not in accord with the law or evidence." Calaycay explained that "solicitations for consensual sex" did not constitute an intent to cause bodily injury, and "[CW] testified unequivocally that she believed [Calaycay's] solicitations were offers to give her sexual pleasure, not pain, illness or bodily impairment." Thus, Calaycay argued, there was reasonable doubt as to one of the material elements of harassment under HRS §§ 711-1106(1)(b) and (f). The district court did not directly rule on Calaycay's Motion for Reconsideration, but implicitly denied the motion through entry of its Findings of Fact, Conclusions of Law, and Order (FOFs, COLs, and Order), discussed below.

### b. Findings of Fact, Conclusions of Law

The district court's FOFs included the following:

2.d.i:      [CW] understood 'hit you from the back' to
            mean that [Calaycay] wanted to subject her
            to sexual pleasure.

2.d.ii:     [CW] testified that Defendant's remarks
            made her feel uncomfortable and awkward.

. . . .

3.b:        [The statements that Calaycay made to CW
            at night, from outside of her balcony,]
            made [CW] feel awkward, uncomfortable,
            unsafe, and scared.

11

. . . .

5:        The Court found [CW's] testimony to be credible.

The district court's COLs included the following:

4.a:    Unwelcome and unsolicited sexual advances, given [CW's] place of inferiority with respect to [Calaycay's] position of power and control, sufficiently establish the intent element of "to harass, annoy, or alarm."

4.b:    When [CW] testified that she was concerned for her safety - that she felt scared, unsafe, and uncomfortable - notwithstanding the fact that she understood [Calaycay's] saying, "I want to hit you from the back," to mean that he wanted to subject her to sexual pleasure, the fact that she was concerned for her safety is sufficient evidence that [Calaycay] made communication to [CW] containing offensive language. State v. Bush, 98 Hawai'i 459, 50 P.3d 428 (2002). Especially where [Calaycay] communicated offensively coarse language at night at [CW's] place of slumber.

5:       [Calaycay's] interaction with [CW] at the exercise field sufficiently qualifies as an insult.

5a:      Although a portion of [HRS § 711-1106(1)(b)] supports more of a scenario where someone intends to provoke a fight, however, the facts in the instant case are sufficient to qualify as insulting.

6:       Both the insult and the offensively coarse language caused the recipient in this case to believe that [Calaycay] had some kind of intent to have non-consensual sexual contact with her.

6a:      Non-consensual sexual contact can rise to the level of bodily injury.

. . . .

7:       A reasonable seventeen year old Cadet in [CW's]

> position could reasonably fear that [-] by being propositioned for sexual acts by someone of [Calaycay's] position of power and control[,] to the point that she felt scared, unsafe, and uncomfortable [-] non-consensual sexual contact, and thus bodily injury, might ensue.[6]

The district court's order stated, "the State of Hawai'i has met its burden of proof beyond all reasonable doubt, and the Defendant, Burt Calaycay, . . . is hereby found guilty of the offense of Harassment, in violation of Sections 711-1106(1)(b) and (1)(f) of the Hawai'i Revised Statutes."

### c. Final Judgment

Pursuant to its FOFs, COLs, and Order, the district court entered a Notice of Entry of Judgment and/or Order (Final Judgment) convicting Calaycay of Harassment and imposing a $100 fine and a $30 criminal injuries compensation fee.

## C. ICA Proceedings

Calaycay timely appealed the district court's Final Judgment to the ICA. In addition to reiterating his position that the State's Complaint improperly charged him, Calaycay challenged the district court's denial of his Motion for Judgment of Acquittal and Motion for Reconsideration on the grounds that there was insufficient evidence to convict him of harassment under either HRS § 711-1106(1)(b) or HRS § 711-1106(1)(f).

---

[6] The FOFs, COLs, and Order were proposed by the State and entered by the district court without revision. Calaycay filed written objections to proposed FOF Nos. 2 and 3 as "misleading," and opposed COL Nos. 4, 5, 6, and 7 as "unclear and erroneous factual conclusions not supported by evidence."

Calaycay also argued that FOF Nos. 2.d.ii and 5, and COL Nos. 4a, 4b, 5, 5a, 6, 6a, and 7 "were clearly erroneous and not supported by the evidence or the law."  Finally, Calaycay claimed his conviction under HRS § 711-1106(1)(b) and HRS § 711-1106(1)(f) violated his constitutional right to free speech, because the statutory provisions were impermissibly vague and overbroad.

The ICA held that the district court did not err by denying Calaycay's Motion to Compel Election or to Dismiss Complaint.[7]  It also determined that there was insufficient evidence to convict Calaycay of harassment.  The ICA explained that because CW's testimony showed that she did not believe Calaycay intended to hurt her, there was no evidence to support an essential element of the offense of harassment:

> When the evidence is viewed in the light most favorable to the prosecution, a reasonable mind could not fairly conclude guilt beyond a reasonable doubt because the State failed to produce evidence of all the elements necessary to convict Calaycay of Harassment.  State v. Hicks, 113 Hawai'i 60, 69, 148 P.3d 493, 502 (2006).  Specifically, the evidence presented failed to demonstrate Calaycay's statements caused the complainant (CW) to reasonably believe that Calaycay intended to cause her bodily injury.  HRS § 711-1106(1)(b) and (f).  The State must prove that the victim in fact reasonably believed that the defendant intended to cause her bodily injury.  State v. Bush, 98 Hawai'i 459, 460, 50 P.3d 428, 429 (2002).

Accordingly, the ICA held that the district court erred in denying Calaycay's Motion for Judgment of Acquittal and in

---

[7]     Because Calaycay does not challenge this ruling on certiorari, we do not address it here.

14

finding Calaycay guilty of harassment.[8]  The ICA did not address whether there was substantial evidence in the record supporting the remaining element of the offense and the requisite state of mind, nor did it specifically discuss the district court's FOFs and COLs or reach Calaycay's constitutional challenge.  The ICA entered a Judgment on Appeal reversing the district court's Final Judgment and vacating Calaycay's conviction.

## D.   Application for Writ of Certiorari

On certiorari, the State argues that the ICA erred in applying CW's "sexual pleasure" comment to all of Calaycay's statements.  The State contends that, had the ICA properly viewed the testimony in the light most favorable to the State, it would have limited its consideration of the comment only to the act of licking, and afforded greater weight to CW's testimony that she felt uncomfortable, scared, and unsafe.  In addition, the State argues that the ICA erroneously substituted its own assessment of

---

[8]      The ICA held that "[t]he District Court erred by denying the Motion for Judgment of Acquittal."  However, by presenting evidence in the form of his testimony after his Motion for Judgment of Acquittal was denied, Calaycay waived any error made by the district court in denying the motion. State v. Pudiquet, 82 Hawai'i 419, 423, 922 P.2d 1032, 1036 (App. 1996) ("It is well settled that when the defense presents evidence after a motion for judgment of acquittal made at the close of the prosecution's case, any error by the trial court in the denial of the motion is waived by the defense."); State v. Rodrigues, 6 Haw. App. 580, 581, 733 P.2d 1222, 1223 (1987) (the defendant lost his right to contest the trial court's denial of his motion for judgment of acquittal, made at the conclusion of the prosecution's case-in-chief, by introducing evidence after the motion was denied); State v. Mitsuda, 86 Hawai'i 37, 38 n.3, 947 P.2d 349, 350 n.3 (1997) (defendant was not entitled to appellate review of the trial court's denial of his motion for judgment of acquittal under the plain error doctrine because he waived any error by presenting evidence after denial of the motion).  The ICA therefore erred in reviewing the district court's denial of Calaycay's Motion for Judgment of Acquittal.

CW's testimony for that of the district court by concluding that CW's testimony "reflects that she did not believe Calaycay intended to hurt her," despite the district court's conclusion that, in light of Calaycay's position of power, a reasonable person in CW's situation could reasonably fear that bodily injury might ensue.

In response, Calaycay contends that the State should be judicially estopped from arguing that CW's "sexual pleasure" comment applied only to Calaycay's statement that he wanted to lick her, due to "the State's own . . . Finding of Fact No. 2d.i," which is "completely opposite from the argument the State seeks to assert now on appeal."[9]  Should this court disagree with the ICA's determination that there was insufficient evidence supporting the "reasonable belief" element of the offense, Calaycay also requests that we consider the following arguments, which were raised on appeal, but not addressed by the ICA:

> 1)   There was insufficient evidence that the Defendant acted with the requisite intent to harass, annoy or alarm.
>
> 2)   There was insufficient evidence that Defendant's words and/or conduct constituted an "insult, taunt or

---

[9]    We note that the State is not judicially estopped from arguing that CW's "sexual pleasure" response referred only to the act of licking. Although the State proposed FOF No. 2.d.i, which states, "[CW] understood 'hit you from the back' to mean that the Defendant wanted to subject her to sexual pleasure," the FOFs and COLs are properly attributed to the district court and should not be construed as a position "taken by the prosecutor at trial." Furthermore, the State drafted the proposed FOFs and COLs at the direction of the district court and the record reflects the State's intent to draft the proposed FOFs and COLs so that they reflected statements made by the district court at trial.

challenge."[10]

3)      There was insufficient evidence that Defendant's words
        and/or conduct constituted "offensively coarse language."

4)      Defendant's conviction for harassment violated his right to
        Freedom of Speech under both the United States and Hawai'i
        State Constitutions.

## II.   STANDARDS OF REVIEW

## A.    Sufficiency of the Evidence

We have long held that evidence adduced in the trial
court must be considered in the strongest light for
the prosecution when the appellate court passes on the
legal sufficiency of such evidence to support a
conviction; the same standard applies whether the case
was before a judge or a jury.  The test on appeal is
not whether guilt is established beyond a reasonable
doubt, but whether there was substantial evidence to
support the conclusion of the trier of fact.  Indeed,
even if it could be said in a bench trial that the
conviction is against the weight of the evidence, as
long as there is substantial evidence to support the
requisite findings for conviction, the trial court
will be affirmed.

"Substantial evidence" as to every material element of
the offense charged is credible evidence which is of
sufficient quality and probative value to enable a
[person] of reasonable caution to support a
conclusion.  And as trier of fact, the trial judge is
free to make all reasonable and rational inferences
under the facts in evidence, including circumstantial
evidence.

State v. Batson, 73 Haw. 236, 248–49, 831 P.2d 924, 931 (1992)

(citations omitted).

---

[10]      Because we resolve the case under HRS § 711-1106(1)(f), we need
not address whether there was substantial evidence adduced at trial that
Calaycay insulted, taunted, or challenged CW for purposes of HRS § 711-
1106(1)(b).  See infra note 11, at 20.

## B.    Constitutional Challenges - Vagueness and Overbreadth

When confronted with a constitutional challenge of a penal statute on the grounds of vagueness or overbreadth, we apply a number of principles on appeal.

First, [t]he constitutionality of a statute is a question of law which is reviewable under the right/wrong standard.  Additionally, where it is alleged that the legislature has acted unconstitutionally, this court has consistently held that every enactment of the legislature is presumptively constitutional, and a party challenging the statute has the burden of showing unconstitutionality beyond a reasonable doubt.  The infraction should be plain, clear, manifest, and unmistakable.

Second, we construe penal statutes narrowly, considering them in the light of precedent, legislative history, and common sense.

. . . .

Third, where possible, we will read a penal statute in such a manner as to preserve its constitutionality.

. . . .

Put differently, a statute will not be held unconstitutional by reason of uncertainty if any sensible construction embracing the legislative purpose may be given it.  Mere difficulty in ascertaining its meaning, or the fact that it is susceptible to interpretation will not render it nugatory.

State v. Gaylord, 78 Hawai'i 127, 137-38, 890 P.2d 1167, 1177-78 (1995) (citations and internal quotation marks omitted).

### III.  DISCUSSION

In order to convict Calaycay of harassment, it was the State's burden to prove all elements of the offense, as well as the requisite state of mind, beyond a reasonable doubt.  HRS

18

§§ 701-114(1)(a)-(b) (2014). As applied to the instant case, the elements of harassment under HRS § 711-1106(1)(f) are: 1) Calaycay's statements to CW constituted a communication using offensively coarse language; and 2) Calaycay's statements caused CW to reasonably believe that Calaycay intended to cause her bodily injury. HRS § 702-205(a) (2014) ("The elements of an offense are such (1) conduct, (2) attendant circumstances, and (3) results of conduct, as . . . [a]re specified by the definition of the offense[.]"); Bush, 98 Hawaiʻi at 460, 50 P.3d at 429 (holding that in order to satisfy the second element of harassment under HRS § 711-1106(1)(f), the State was required to prove that the recipient of Bush's communication, in fact, reasonably believed Bush intended to cause bodily injury to the recipient or another, or damage to the property of the recipient or another). The requisite state of mind is the specific "intent to harass, annoy, or alarm." HRS § 711-1106(1).

On appeal, the ICA determined that "CW's testimony, even taken in the light most favorable to the prosecution . . . does not furnish substantial evidence" of the second element of harassment. As such, the ICA held that the district court erred in denying Calaycay's Motion for Judgment of Acquittal and in convicting Calaycay of harassment. The ICA vacated Calaycay's conviction accordingly. We disagree.

As set forth below, there was substantial evidence to support Calaycay's harassment conviction under HRS § 711-

19

1106(1)(f).[11]  Furthermore, HRS § 711-1106(1)(f) is not
unconstitutionally vague or overbroad, and Calaycay's harassment
conviction did not violate his First Amendment right to the
freedom of speech.  We therefore reverse the ICA's Judgment on
Appeal and affirm the district court's Final Judgment convicting
Calaycay of harassment.

## A.   Calaycay's Conviction Was Supported by Substantial Evidence Adduced at Trial

We review the entire evidentiary record of the trial to
determine whether, when considered in the strongest light for the
prosecution, there was substantial evidence to support the
conviction.  Batson, 73 Haw. at 248-49, 831 P.2d at 931.  As set
forth below, there was substantial evidence adduced at trial to
support both elements of harassment and the requisite state of
mind, pursuant to HRS § 711-1106(1)(f).

### 1.   The First Element - the Conduct

To satisfy the first element of harassment under HRS
§ 711-1106(1)(f), it was the State's burden to prove beyond a
reasonable doubt that Calaycay "made a communication using
offensively coarse language."  The district court concluded that

---

[11]  Because we conclude that substantial evidence was adduced at trial
to support Calaycay's conviction under HRS § 711-1106(1)(f), we need not
determine whether there was substantial evidence to support Calaycay's
conviction under HRS § 711-1106(1)(b).  State v. Nesmith, 127 Hawai'i 48, 61,
276 P.3d 617, 630 (affirming OVUII conviction under HRS § 291E-61(a)(3) where
defendant was charged under HRS §§ 291E-61(a)(1) and/or 291E-61(a)(3)).

Calaycay's interaction with CW at the exercise field, and his interaction with her outside her sleeping quarters, both constituted communications using offensively coarse language, satisfying the first element of HRS § 711-1106(1)(f).

CW testified that on October 25, 2013, in the Academy's exercise field, Calaycay told her that he wanted to have sex with her, get her wet, hit her from the back, and have her ride him. CW further testified that seven days later, on November 1, 2013, she was awoken by Calaycay calling to her. He told her that he wanted to see her naked and hook up with her. In addition, CW alleged that Calaycay told her that he wanted to lick her, which she understood as a sexual comment. It is unclear when Calaycay made this statement.

As observed by the district court,

> In reviewing whether [] words or conduct constituted harassment, the relevant test is objective, not subjective. <u>State v. Taliferro</u>, 77 Hawai'i 196, 881 P.2d 1264 (1994). But the fact that this standard is objective does not mean it is uniform in all situations, and often the issue of criminal liability will turn on the matter of context. <u>In [Interest of] Doe</u>, 76 Hawai'i 85, 869 P.2d 1304 (1994).

It is undisputed that Calaycay's statements to CW constitute "communications" for purposes of HRS § 711-1106(1)(f). However, Calaycay contends that the language he allegedly used "did not rise to the level of offensively coarse language[;]" rather, he was merely "using local teenage slang with a local teenage girl." To the contrary, we conclude that there was

21

substantial evidence adduced at trial to establish that the statements that Calaycay made to CW on October 25, 2013 and on November 1, 2013, constituted communications using offensively coarse language.

The language contained in Calaycay's statements is "offensively coarse" due to its graphic, sexual, and intensely personal nature. Bush, 98 Hawai'i at 460-61, 50 P.3d at 429-30 (holding that the defendant's statements to the complainant that "[her] nipples look really good," that he "wants to suck on [her] nipples 'cause he likes [her] nipples," and "Bitch, you wait . . . I'm gonna do something to you," constituted communication using offensively coarse language for purposes of HRS § 711-1106(1)(f)). Thus, CW's testimony, when considered in the strongest light for the prosecution, established that Calaycay's statements constituted communications using offensively coarse language, satisfying the first element of harassment, pursuant to HRS § 711-1106(1)(f).

### 2. The Second Element - the Result of the Conduct

To satisfy the second element under HRS § 711-1106(1)(f), it was the State's burden to prove beyond a reasonable doubt that, as a result of Calaycay's statements, CW reasonably believed that Calaycay intended to cause her bodily injury. Bush, 98 Hawai'i at 460, 50 P.3d at 429. The district

22

court concluded that Calaycay's statements "caused [CW] to believe that [Calaycay] had some kind of intent to have non-consensual sexual contact with her," and that "[n]on-consensual sexual contact can rise to the level of bodily injury."  The district court further concluded that "[a] reasonable seventeen year old Cadet in [CW's] position could reasonably fear that [-] by being propositioned for sexual acts by someone of [Calaycay's] position of power and control[,] to the point that she felt scared, unsafe, and uncomfortable [-] non-consensual sexual contact, and thus bodily injury, might ensue."  The district court thus determined that this element was satisfied.

In contrast, the ICA concluded that "the evidence presented failed to demonstrate Calaycay's statements caused [CW] to reasonably believe that Calaycay intended to cause her bodily injury."  It therefore reversed the district Court's Final Judgment convicting Calaycay of harassment.  As set forth below, we conclude that, when considered in the light most favorable to the prosecution, CW's testimony constitutes substantial evidence that Calaycay's statements caused her to reasonably believe that he intended to cause her bodily injury.

CW testified that the statements Calaycay made to her on the exercise field regarding the sexual acts that "he wanted to do to [her]" made her feel uncomfortable, unsafe, and scared.

Despite the fact that CW did not solicit or welcome his advances, CW further testified that Calaycay approached her again seven days later, as she slept. The statements that Calaycay made to CW from outside her window made her once again feel uncomfortable, unsafe, and scared.

CW's testimony indicates that she felt threatened by Calaycay and believed that he intended to subject her to non-consensual sexual contact. CW's testimony that she felt scared and unsafe further indicates that Calaycay's statements put her in apprehension of bodily injury. CW's testimony thus provided substantial evidence that, as a result of Calaycay's statements, CW believed that Calaycay intended to cause her bodily injury.[12]

There was also substantial evidence adduced at trial that CW's belief was reasonable. CW and Calaycay both testified that, as a cadre at the Academy, Calaycay had supervisory and disciplinary authority over CW. CW further testified that Calaycay isolated her from the other cadets and cadres before making unsolicited and unwelcome sexually explicit statements to

---

[12] The ICA erred by applying CW's "sexual pleasure" comment to the entirety of Calaycay's statements and concluding that "CW's testimony . . . reflects that she did not believe Calaycay intended to hurt her." CW made this comment in response to the question, "when [Calaycay] said he wanted to lick you, did you believe that . . . he was trying to tell you that he was gonna hurt you or have you experience sexual pleasure?" (Emphasis added). The scope of the question, and therefore the application of CW's response, is limited only to Calaycay's statement that he wanted to lick her. Thus, contrary to the ICA's determination, CW's "sexual pleasure" comment did not limit or modify her testimony that Calaycay's other statements made her feel uncomfortable, unsafe, and scared.

her on the exercise field. Despite Calaycay's testimony that he did not live at the Academy and he was not assigned to supervise the female cadets, CW testified that Calaycay awoke her seven days later by calling to her from outside her dormitory window. Calaycay then made additional sexually explicit statements to her.

CW's testimony regarding the context in which Calaycay made his statements to her and the power dynamic at play constitutes substantial evidence that CW's belief that Calaycay intended to cause her bodily injury was reasonable. <u>Doe</u>, 76 Hawai'i at 95, 869 P.2d at 1314 (stating the issue of criminal liability will often turn on a matter of context). Thus, there was substantial evidence adduced at trial to establish that Calaycay's statements caused CW to reasonably believe that he intended to cause her bodily injury, the second element of harassment, pursuant to HRS § 711-1106(1)(f).[13]

---

[13]    It is important to note that Hawai'i law recognizes and accounts for the power dynamic present here. Under HRS § 707-733(1)(d) (Supp. 2018), a person commits the offense of Sexual Assault in the Fourth Degree if:

> The person knowingly engages in or causes sexual contact with a minor who is at least sixteen years old and the person is contemporaneously acting in a professional capacity to instruct, advise, or supervise the minor; provided that:
>
> (i)    The person is not less than five years older than the minor; and
>
> (ii)   The person is not legally married to the minor.

(continued...)

### 3.    The Requisite State of Mind

The requisite state of mind under HRS § 711-1106(1)(f) is the specific "intent to harass, annoy, or alarm" CW.  The district court concluded that Calaycay's "[u]nwelcome and unsolicited sexual advances, given [CW's] place of inferiority with respect to [Calaycay's] position of power and control, sufficiently establish[ed] the intent element of 'to harass, annoy, or alarm.'"

> The law recognizes the difficulty by which intent is proved in criminal cases.  We have consistently held that since intent can rarely be proved by direct evidence, proof of circumstantial evidence and reasonable inferences arising from circumstances surrounding the act is sufficient to establish the requisite intent.  Thus, the mind of an alleged offender may be read from his acts, conduct, and inferences fairly drawn from all of the circumstances.

State v. Kiese, 126 Hawai'i 494, 502-03, 273 P.3d 1180, 1188-89 (2012) (quoting State v. Sadino, 64 Haw. 427, 430, 642 P.2d 534, 536-37 (1982)).

To determine whether sufficient evidence was adduced at trial to support the requisite state of mind for harassment under HRS § 711-1106, courts in this jurisdiction engage in a fact-intensive, case-by-case analysis of the defendant's conduct and the totality of the surrounding circumstances.  See e.g., Kiese,

---

(...continued)
At the time of the interactions in question, CW was 17 years old and Calaycay was 28 years old.  The two were not married and as a cadre, Calaycay was acting in a professional capacity to instruct, advise, or supervise CW.

126 Hawai'i at 504, 273 P.3d at 1190 (holding that the defendant's choice to repeatedly strike the minor complainant with a bamboo stick, leaving visible welts, despite his testimony that a spanking with his hand probably would have corrected the minor complainant's misbehavior, constituted substantial evidence that he intended to harass, annoy, or alarm the minor complainant); State v. Graybeard, 93 Hawai'i 513, 6 P.3d 385 (App. 2000) (holding that testimony that the defendant came up behind the complainant unexpectedly, threatened him, and publicly denigrated him for ten minutes without provocation or justification constituted substantial evidence that the defendant acted with the intent to harass, annoy or alarm the complainant); Taliferro, 77 Hawai'i at 200, 881 P.2d at 1268 (holding that the defendant's testimony that he was angry because dog feces were left in his yard, and that he picked up the feces and walked to the complainant's property in order to return them, was sufficient evidence to prove that the defendant intended to annoy the complainant); State v. Hopkins, 60 Haw. 540, 592 P.2d 810 (1979) (holding that testimony that the defendants approached the complainants from behind, grabbed and pulled them, and that one of the defendants put her hand into the back pocket of one of the complainants, while the complainants resisted, constituted substantial evidence that the defendants acted with the intent to

harass, annoy, or alarm the complainants).

We conclude that CW's testimony constitutes substantial evidence to support the requisite state of mind with regard to Calaycay's conduct. CW's testimony regarding the statements that Calaycay made to her on the exercise field indicates that Calaycay's initial advances were unwelcome. Yet, Calaycay continued to pursue CW and made additional unsolicited, sexually explicit statements to her seven days later. On this occassion, Calaycay chose to approach CW's dormitory in the middle of the night, and to awaken her by calling to her from outside her dormitory window. The repeated, coercive, and intrusive nature of Calaycay's conduct indicates an intent to harass CW.

Furthermore, CW's testimony that Calaycay's statements made her feel scared and unsafe demonstrates that Calaycay's uninvited and unwelcomed conduct created an intimidating situation for CW that gave her a perception of imminent danger and put her in fear. Thus, when considered in the strongest light for the prosecution, CW's testimony regarding the nature of Calaycay's statements and the isolating and intrusive circumstances under which he chose to make them, despite the fact that CW rebuffed Calaycay's sexual advances just one week prior, constitutes substantial evidence that Calaycay acted with the requisite state of mind of harassment, pursuant to HRS § 711-

28

1106(1)(f). Because both elements of harassment and the requisite state of mind under HRS § 711-1106(1)(f) were supported by evidence adduced at trial, the district court did not err in convicting Calaycay of harassment.

**B.     Calaycay's Constitutional Challenges are Without Merit**

Calaycay argues that HRS § 711-1106(1)(f) is unconstitutionally overbroad as applied to him.  He also argues that the statute is facially vague and overbroad.

Under the applicable case law, HRS § 711-1106(1)(f) has a presumption of constitutionality.  Gaylord, 78 Hawai'i at 137, 890 P.2d at 1177.  It is Calaycay's burden to show unconstitutionality beyond a reasonable doubt.  Id.  As set forth below, he has failed to meet this burden.

**1.     HRS § 711-1106(1)(f) is Not Overbroad as Applied to Calaycay**

Calaycay contends that, because his harassment conviction criminalized his alleged statements, which "[constituted] clearly protected speech," HRS § 711-1106(1)(f) was unconstitutionally overbroad as applied to him.  Contrary to his contentions, however, Calaycay's statements do not constitute protected speech and therefore, his as-applied challenge is without merit.

"The First Amendment [of the United States Constitution] and article I, § 4 of the Hawai'i Constitution

29

prohibit the enactment of any law that abridges freedom of speech." State v. Alangcas, 134 Hawai'i 515, 528, 345 P.3d 181, 194 (2015). However, the Supreme Court of the United States "has carved out some limited categories of unprotected speech, including . . . speech integral to criminal conduct." United States v. Osinger, 753 F.3d 939, 946 (9th Cir. 2014). This court has similarly held that speech employed to promote or facilitate the commission of a crime is unprotected by the Hawai'i constitution. State v. Manzo, 58 Haw. 440, 444, 573 P.2d 945, 949 (1977); Alangcas, 134 Hawai'i at 529, 345 P.3d at 195. Calaycay's statements fall within this exception to the constitutionally protected freedom of expression.

HRS § 711-1106(1)(f) was not unconstitutionally applied to Calaycay because Calaycay employed the speech at issue to promote or facilitate the commission of a crime. Calaycay argues that "all the State's evidence showed was a solicitation to have a sexual encounter." However, under the circumstances of this case, such a solicitation is criminalized pursuant to HRS § 707-733(1)(d). See supra, note 14, at 27. "[S]peech is not protected when it is merely the vehicle through which a [criminal] ensnares the victim." Alangcas, 134 Hawai'i at 528, 345 P.3d at 194. As such, Calaycay's statements do not constitute protected speech, and were properly criminalized under

HRS § 711-1106(1)(f).

Furthermore, "state free speech provisions are not generally violated by criminal statutes that, properly drawn, are aimed at the <u>injurious effects</u> of a threatening communication rather than the <u>communication itself</u>." Doe, 76 Hawai'i at 93 n.16, 869 P.2d at 1312 n.16 (internal quotation marks and brackets omitted) (quoting J. Friesen, State Constitutional Law: Litigating Individual Rights, Claims and Defenses § 5.04[3] at 5-20 to 5-20.1). We have stated that, for speech to be punishable under the harassment statute, "there must be a causal relationship between the speech at issue and the disturbance sought to be prevented. . . . <u>Establishing such a causal relationship obviously requires an examination of the totality of the circumstances</u>, or, put differently, the context in which the speech is uttered." Id. at 96, 869 P.2d at 1312 (emphasis added).

HRS § 711-1106(1)(f) is aimed at preventing the injurious effect on the recipient, only criminalizing statements made "with intent to harass, annoy, or alarm any other person," using "offensively coarse language," that "cause the recipient to reasonably believe that the [speaker] intends to cause bodily injury to the [recipient] or another." Under the totality of the circumstances, the evidence contained in the record sufficiently

31

establishes a causal relationship between Calaycay's unsolicited, repeated, and sexually explicit statements, and the disturbance sought to be prevented by HRS § 711-1106(1)(f): CW's reasonable belief that Calaycay intended to cause her bodily injury.  Cf. Id. at 100, 869 P.2d at 1319 (finding no causal relationship between Minor's statement, "Hey, if you like go, take your badge off," and the disturbance sought to be prevented by HRS § 711-1106(1)(b) - provoking the recipient police officer to a violent response).  A person who, with the intent to harass, annoy, or alarm another, makes a communication using offensively coarse language, thereby causing the recipient to reasonably believe the person intends to inflict bodily injury, will not find shelter behind the First Amendment.  Cf. State v. Burkert, 174 A.3d 987, 1002 (N.J. 2017).  Calaycay's constitutional right to the freedom of expression was not violated by the criminalization of his statements under HRS § 711-1106(1)(f).

## 2.  HRS § 711-1106(1)(f) is Not Facially Unconstitutional

In Pacquing, this court discussed overbreadth challenges as follows:

> An overbreadth challenge is typically available only to individuals who "assert that [their] constitutionally protected conduct is being prosecuted by the State." Id.  In instances where it is contended that the challenged statute affects constitutionally protected freedom of expression or "reaches a substantial amount of constitutionally protected conduct," then an individual may initiate a facial challenge to the statute as overbroad on these grounds. Id. at 528, 345 P.3d at 194 (quoting Vill.

> of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,
> 455 U.S. 489, 494, 102 S.Ct. 1186, 71 L.Ed.2d 362
> (1982)).

State v. Pacquing, 139 Hawaiʻi 302, 309, 389 P.3d 897, 904 (2016)

(emphases added).

Similarly, in Alangcas, this court discussed vagueness

challenges as follows:

> This court has recognized that a statute may be found
> void for vagueness on its face or as applied. See
> State v. Bates, 84 Hawaiʻi 211, 222, 933 P.2d 48, 59
> (1997) (observing that where a case does not involve
> any first amendment issues, a "defendant has standing
> to raise a vagueness challenge only insofar as the
> statute is vague as applied to his or her specific
> conduct")[.]
>
> In order for a defendant to succeed on an as-applied
> challenge, the defendant must demonstrate that the
> disputed statute is vague with respect to his or her
> conduct. However, when a statute burdens a
> significant constitutional right, such as the freedom
> of expression, a defendant whose rights are not
> violated may raise the constitutional rights of
> others. See [State v. Beltran, 116 Hawaiʻi 146, 151
> n.4, 172 P.3d 458, 463 n.4 (2007)].

Alangcas, 134 Hawaiʻi at 531, 345 P.3d at 197 (emphasis added)

(some citations omitted).

Because Calaycay contends that HRS § 711-1106(1)(f)

burdens the constitutionally protected right to free speech, and

we have previously acknowledged that HRS chapter 711 "normally

involves first amendment issues," Calaycay may initiate facial

challenges to the statute despite our conclusion that his as-

applied overbreadth challenge is without merit. Doe, 76 Hawaiʻi

at 94, 869 P.2d at 1313. We therefore resolve Calaycay's facial

overbreadth and vagueness challenges, below.

### a.   Scope of Prohibited Conduct

When confronted with a constitutional challenge of a penal statute on the grounds of overbreadth and vagueness, "a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct." Alangcas, 134 Hawai'i at 525, 345 P.3d at 191 (internal quotation marks and citations omitted).  "In determining whether a substantial amount of protected activity was affected, . . . the scope of the prohibited conduct requires determination."  Id. (citing United States v. Williams, 553 U.S. 285, 293 (2008)).

The conduct prohibited by HRS § 711-1106(1)(f) is as follows:

> (1)   A person . . . with intent to harass, annoy, or alarm any other person[:]
>
> . . . .
>
> (f)   Makes a communication using offensively coarse language that would cause the recipient to reasonably believe that the actor intends to cause bodily injury to the recipient or another or damage to the property of the recipient or another.

As noted above, HRS § 711-1106(1)(f) contains two conduct elements: (1) a communication; (2) using offensively coarse language.  The statute also contains a result of conduct element: the actor's communication actually causes the recipient to reasonably believe that the actor intends to cause bodily injury to the recipient or another, or damage to the property of

34

the recipient or another.  Bush, 98 Hawaiʻi at 460, 50 P.3d at 429 (under HRS § 711-1106(1)(f), the State must show that the recipient of the defendant's communication, in fact, reasonably believed the defendant intended to cause bodily injury to the recipient or another, or damage to the property of the recipient or another).  The requisite state of mind of the actor is the specific "intent to harass, annoy, or alarm."  HRS § 711-1106(1).

> **b.    HRS § 711-1106(1)(f) is Not Facially Overbroad**

Calaycay contends that HRS § 711-1106(1)(f) is unconstitutionally overbroad because it "sweep[s] up constitutionally protected speech[.]"  "When the scienter requirement of a statute sufficiently limits criminal culpability to reach only conduct outside the protection of the First Amendment, legitimate speech is not endangered."  Alangcas, 134 Hawaiʻi at 528, 345 P.3d at 194 (citing United States v. Dhingra, 371 F.3d 557, 561 (9th Cir. 2004).  However, a specific intent requirement, such as the one employed by HRS § 711-1106(1), "fails to eliminate overbreadth concerns whenever the 'effect' (e.g., to harass, to annoy, to alarm, etc.) associated with the intent provision is broad enough to encompass a substantial amount of protected activity."  People v. Smith, 862 P.2d 939, 942 (Colo. 1993).

Harassment statutes that criminalize "offensively

coarse" communications and contain a specific intent requirement generally withstand facial overbreadth challenges where they contain other limiting restrictions. Compare State v. Koetting, 616 S.W.2D 827 (Mo. 1981) (Missouri's harassment statute was not overbroad because it applied "only to protect the privacy of persons within their own homes") and Burkert, 174 A.3d 987 (New Jersey's harassment statute was not facially overbroad because the statute impliedly limited the prohibited conduct to repeated communications directed at a person that reasonably put that person in fear for his safety or security, or that intolerably interfere with that person's reasonable expectation of privacy) with Smith, 862 P.2d 939 (Colorado's harassment statute was overbroad on its face where there were no limiting constrictions that would render the statute constitutional).

Because HRS § 711-1106(1)(f) only criminalizes speech when it is employed with the specific "intent to harass, annoy, or alarm," when it involves "offensively coarse language," and when it causes the recipient to reasonably believe the speaker intends to cause bodily injury or property damage, criminal culpability under the statutory provision is sufficiently limited to reach only unprotected speech.[14] Thus, Calaycay's overbreadth

---

[14] Several states have upheld similar statutes based on their determination that harassment is not protected speech:

(continued...)

36

challenge is without merit.

### c.  HRS § 711-1106(1)(f) is Not Facially Vague

"A penal statute is void for vagueness if it does not define a criminal offense with sufficient definiteness so that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."  Pacquing, 139 Hawai'i at 314, 389 P.3d at 909 (citations, internal quotation marks, and brackets omitted).  As such, we resolve a facial challenge to a criminal statute for vagueness by determining if the statute: "(1) is internally inconsistent and incomprehensible to a person of ordinary intelligence[;] or (2) invites delegation of basic policy matters to police for resolution on an ad hoc and subjective basis."  Alangcas, 134 Hawai'i at 532, 345 P.3d at 198 (citing Beltran, 116 Hawai'i at 153, 172 P.3d at 465).

Calaycay makes no argument that HRS § 711-1106(1)(f) is internally inconsistent and, from a plain reading of the statute,

---

[14](...continued)
> Prohibiting harassment is not prohibiting speech, because harassment is not a protected speech. Harassment is not communication, although it may take the form of speech. . . .  It has never been deemed an abridgment of freedom of speech . . . to make a course of conduct illegal merely because the conduct was in part . . . carried out by means of language, either spoken, written, or printed.

State v. Thorne, 333 S.E.2d 817, 820, 820 n.5 (W.Va. 1985)(West Virginia's statute proscribing phone calls made with the intent to harass was not overbroad because the statute did not prohibit communicative speech).

a person of ordinary intelligence would comprehend that it only criminalizes a subset of speech that: (1) utilizes offensively coarse language; (2) is uttered with the intent to harass, annoy, or alarm; and (3) actually causes the recipient to reasonably believe the speaker intends to cause bodily injury or property damage. Although the statute fails to define "harass," "annoy," or "alarm," these terms have commonly understood definitions that provide adequate notice to the public and sufficient guidance for enforcement. See e.g., Galloway v. State, 781 A.2d 851, 868 (Md. 2001) ("the terms 'annoy,' 'alarm,' and 'harass' are commonly understood by ordinary people and, as such, provide fair notice to potential offenders and adequate guidance for enforcement").

Calaycay argues that HRS § 711-1106(1)(f) is unconstitutionally vague because the term "'offensively coarse language' is open to too many subjective interpretations[.]" However, while the term "offensively coarse language" may be vague in isolation, when read within the context of the statute, it is unlikely that the public will misunderstand this term given the clear statutory definition of the scope of prohibited conduct. State v. Mortimer, 641 A.2d 257, 266 (N.J. 1994) (holding that New Jersey's harassment statute was not unconstitutionally vague, although the phrase "offensively coarse language" may be vague in isolation, because the imposition of a

38

specific intent requirement sufficiently clarified the proscribed conduct); cf. Alangcas, 134 Hawai'i at 535, 345 P.3d at 201 (the likelihood that anyone would not understand the word "communicates" is quite remote where clear requirements of the statute defined the prohibited conduct).

Moreover, HRS § 711-1106(1)(f) imposes a reasonable person standard by requiring the recipient of the communication to reasonably believe that the actor intends to cause bodily injury to the recipient or another, or damage to the property of the recipient or another.  Employing a reasonable person standard further ameliorates the concern that a statute is unconstitutionally vague.  Galloway, 781 A.2d at 871-72 (reading a reasonable person standard into Maryland's harassment statute to narrow the statute's construction and provide an appropriate guide to conduct); People v. Ewing, 90 Cal.App.4th 199, 208-09 (Cal. Ct. App. 1999) (reading a reasonable person standard into the definition of harassment in determining that California's stalking statute was not void for vagueness).

Calaycay makes no argument that the statute invites delegation of basic policy matters to police for resolution on a subjective basis.  Calaycay's vagueness challenge is therefore without merit.

## IV.   CONCLUSION

Calaycay's harassment conviction was supported by substantial evidence and his constitutional challenges are without merit.  We therefore reverse the ICA's Judgment on Appeal.  The district court's Final Judgment convicting Calaycay of harassment, pursuant to HRS § 711-1106(1)(f), is affirmed.

Sonja P. McCullen                    /s/ Mark E. Recktenwald
for petitioner
                                     /s/ Paula A. Nakayama
Dwight C.H. Lum
for respondent                       /s/ Sabrina S. McKenna

Kimberly Tsumoto Guidry             /s/ Richard W. Pollack
for amicus curiae
                                     /s/ Michael D. Wilson

